THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM DUNCAN LAND, Defendant-Appellant.

Fourth District   No. 4—91—0724

Opinion filed March 4, 1993.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In July 1991, a jury convicted defendant, William Land, of three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)) of his eight-year-old daughter, C.L. The trial court later sentenced him to three consecutive 20-year prison terms. Defendant appeals, arguing that (1) the trial court erred by admitting C.L.'s hearsay statements under section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 115—10), (2) the State failed to prove him guilty beyond a reasonable doubt of two of the three convictions because C.L. testified at trial that the sexual conduct occurred only one time, (3) the trial court erred by not allowing defendant to introduce evidence that other persons had sexually abused C.L., and (4) the trial court committed plain error by failing to instruct the jury on an essential element of the crime charged.

We disagree with all of defendant's arguments and affirm.

## I. BACKGROUND

Prior to February 1990, defendant, his wife (Joyce Land), C.L. (born in May 1983), and their two sons lived together on Washington Street in Bloomington. In February 1990, the family moved to Olive Street in Bloomington. In August 1990, C.L. went to live in a foster home with Wilma and Al McLaughlin for reasons that the trial court held were inadmissible and therefore not revealed at trial.

Starting in February 1990, and at the request of C.L.'s public school, C.L. visited weekly with Diana Quick, an outreach caseworker and counselor for McLean County center for human services. As a part of C.L.'s therapy, Quick and C.L. kept a "journal about anything." Although C.L. could not write, Quick would write whatever C.L. wanted Quick to write in the journal.

On October 6, 1990, Quick and C.L. (then seven years old) discussed what should go in the journal during one of their weekly meetings. C.L. spoke about some books a friend had shown her about insects, noting that these books were "good books," unlike the books her father owned. When Quick asked her what she meant, C.L. responded that her father's books "were dirty books that had pictures of men and women with no clothing." She also told Quick that her fa-

ther would show the pictures in the books to her and her brothers. C.L. further recalled that her father made her cry when he showed her the pictures, but he would tell her that there was nothing to cry about. C.L. added that he would eventually do "bad stuff [to her], \*\*\* like sex." C.L. remembered that sometimes her mother held C.L.'s arms when her father was doing this "bad stuff" to her and would tell her father to "stop hurting her baby" as she did so.

Because C.L. liked to draw, Quick gave C.L. some markers and paper to draw about these events as she talked about them. As she did so, Quick recalled that C.L. pounded the markers on the paper, breaking three of them. Quick also recalled that "[s]he was crying, stammering, [and] repeating herself frequently."

Quick then brought C.L. to speak with Detective Michael Fazio of the Bloomington police department. As Quick listened, Fazio asked C.L. if she knew why he wanted to speak with her. C.L. said that she did and told Fazio that her father hurt her by spanking her and having sex with her. C.L. told Fazio that defendant would show her " 'dirty, filthy books,' " which made her cry. Defendant would then spank her and tell her that " 'this is what I do with mom and it's okay to do it with you[, too].' " C.L. told Fazio that her father did these things both when they lived in the house they currently lived in (Olive Street) and when they lived in their previous house (Washington Street).

Fazio asked C.L. to tell him about the last time she had sex with her father. C.L. told Fazio that it occurred in the front room at the Olive Street address. Defendant placed her on the couch, took off her clothes, and then put "it" inside of her, which badly hurt her. Her uncle then knocked on the front door. C.L.'s mother came downstairs to answer the door, saw defendant having sex with C.L., and started hitting defendant, shouting " '[D]on't hurt my baby.' " Defendant stopped, and C.L. and defendant then dressed.

Fazio asked C.L. to elaborate on what she meant by "having sex" by using drawings of a naked, adult white male and a naked, white, female, grammar-school-age child, with front and back views. Because C.L. had said that defendant had hurt her, Fazio asked C.L. what defendant had hurt her with. C.L. circled the penis on the male drawing, calling it his "dick." Fazio asked C.L. where he hurt her, and C.L. circled the vaginal area of the female, which she called her "tutu." Fazio asked her if defendant touched her anywhere else. C.L. circled the breast on the female drawing, and said that defendant touched her breast with his breast when he lay on top of her.

Fazio asked her if defendant touched her anywhere else. C.L. pointed to the male's penis and then circled the female's buttocks, saying that he " 'puts it in there,' " clarifying that "it" meant defendant's penis. Using a ballpoint pen and its cap to demonstrate what "in" and "out" meant, C.L. demonstrated that when she said defendant "put it in there," she meant that defendant penetrated her vagina and her anus with his penis.

C.L. also told Fazio that defendant would kiss her on the lips. Fazio asked her if defendant ever put his penis in her mouth, to which she responded "no." He also asked her if she remembered any dates, using holidays and birthdays as reminders, but C.L. could not remember any specific dates.

After speaking to C.L., Fazio went to defendant's residence on Olive Street. After Fazio advised defendant of C.L.'s accusations and his *Miranda* rights, defendant voluntarily accompanied Fazio to the Bloomington police station. Defendant accused Fazio of making up the accusations, claiming that Fazio merely wanted to harass his family. He denied keeping any pornographic books in his house or any books that contained pictures of naked men and women and challenged Fazio to search his house. Fazio took defendant up on his offer and asked defendant to sign a departmental form indicating that defendant consented to the search. Defendant did so. Fazio then placed him in a cell and returned to defendant's residence to search it.

When he arrived at defendant's residence, Fazio met defendant's wife. He informed her that he had arrested defendant and told her that defendant had consented to a search. Fazio asked for her consent, which she gave by signing the consent form below defendant's name.

Fazio first searched defendant's bedroom because C.L. had told him that defendant kept his "dirty books" and magazines there. Fazio found two Penthouse magazines, a paperback book entitled "Sex in Later Life" that described sex acts in text, and a small Copenhagen chewing tobacco can that contained a pipe-cleaner bent into a figure of a person masturbating. One Penthouse magazine also had two additional pages of pictures from another magazine showing men and women engaging in sex acts.

Fazio returned to the police station and confronted defendant with these items. Defendant then accused Fazio of planting the items in his home.

A grand jury thereafter indicted defendant on three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12— 14). Two counts alleged sexual penetration involving defendant's penis

and C.L.'s vagina between January 3 and August 3, 1990, and the other count alleged sexual penetration involving defendant's penis and C.L.'s anus.

Before trial, the trial court conducted a hearing pursuant to section 115—10(b)(1) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b)(1)) to determine whether Fazio, Quick, and C.L.'s foster mother, Wilma McLaughlin, could testify about hearsay statements made by C.L. regarding these accusations. Fazio, Quick, and McLaughlin all testified at this hearing, and the court found these hearsay statements admissible.

At trial, Fazio and Quick both testified to the above facts. When C.L. testified, she became scared and initially testified that she could only remember one incident where her father gave her a "French kiss" on the mouth. Although she initially testified that she "forgot" about any other incident where defendant would touch her, the prosecutor reminded her of her conversation with Detective Fazio. Through leading questions, C.L. answered that defendant did touch her with his private parts. However, C.L. again stopped, saying that she "forgot" what had happened. When asked if she understood that "it's important here today to talk about that and tell these people what happened," C.L. responded "no."

The judge asked the jury to leave the courtroom for a moment and gave the prosecutor a chance to speak to C.L. on the record in the jury's absence. C.L. then admitted that she felt scared to talk in front of the jury about what had happened. When asked if she could be "strong enough" to talk about it, she initially said "no" but eventually said that she would try. Before the jury returned, defense counsel raised the issue of C.L.'s competency but did not object to her competency. Nonetheless, the court still formally ruled C.L. competent to testify.

The jury returned, and C.L. testified that defendant touched her "[t]his place, and the bottom in the back," using her hand to point to where she meant. However, when asked if she had words for those places, she responded, "No, I forgot." The prosecutor then asked her to circle the parts she meant on drawings of a naked male adult and a naked female child. C.L. circled the man's penis and the child's vagina. However, after further questioning, C.L. said that he did not put his penis "inside" of her, and that it stayed "outside."

The prosecutor asked her if he touched her anywhere else. C.L. responded that he did not. Then the prosecutor showed her a drawing of the back view of a naked female child and asked C.L. if she knew what it was. C.L. responded it was her bottom. The prosecutor asked

her if defendant had touched her there, and C.L. responded that he did with both his penis and his hand. Using the drawing, C.L. demonstrated that defendant had placed his penis along the fold between her buttocks. She said that he did not put his penis inside her, although she did admit that it hurt when he placed his penis there.

C.L. then testified that this conduct happened only once. The prosecutor asked her if she remembered telling Detective Fazio, Diana Quick, and her foster mother that it had happened more than once, and C.L. responded that she did. However, as she testified, she said that she could only remember it happening once. She also testified that it happened only when they lived on Washington Street. The prosecutor then questioned her about the dirty pictures. After explaining that her father would show her the pictures and that she told him that she did not like looking at them, she froze up again when asked how her father would respond or react after that.

C.L. also testified that her mother did not know about what defendant would do to her, although she then admitted that her mother walked in on them once. When asked what her mother did when she walked in, C.L. changed her reply to, "No, she didn't. *** No, she didn't say anything because she wasn't there, either." Thereafter, C.L. again became unresponsive until the prosecutor asked C.L., "Do you think things happened to you that you *** can't tell us today?" C.L. responded, "Yes." She also said that the things she told her foster mother, her foster father, Detective Fazio, and Diana Quick did happen.

C.L. was equally uncooperative on cross-examination. However, she did again testify that defendant touched her with his penis only once. Defense counsel also asked her if she got mad when her father would punish her. C.L. responded that she did, but when asked if she ever made up any stories about her father because she was mad at him, she said she did not.

C.L.'s foster mother, Wilma McLaughlin, testified that she had two daughters of her own, the youngest of whom shared a bedroom with C.L. She characterized C.L. as someone who could remember things well, but only when her memories were triggered by certain events. When those reminders happened, C.L. would tell what she remembers without much hesitation.

McLaughlin testified that C.L.'s telling her about what defendant had done to her was one such instance of C.L. suddenly revealing memories in great detail. The same day that C.L. told Quick about what defendant had done, C.L. also told McLaughlin's youngest daughter. The daughter immediately came to McLaughlin saying

" 'Mom, [C.L.] was telling [me] something I think she needs to tell you.' " McLaughlin then testified to the following:

"[C.L.] came down, and *** told me how her dad had been on top of her and her mother had come in and had taken a hold of [C.L.]'s arm while her dad was on top of her. They were on a bed, and [C.L.] was on her back, *** her father was on top of her, and her mother came in and took a hold of her. She demonstrated this [while] [w]e were in the kitchen[.] [S]he held her arms up *** and demonstrated to me how she was held[.] [S]he said her arms were over her head and she was leaning backwards over the bed ***. And I asked her if her mother was holding her, and she said [her mother] was trying to pull her out from under him. *** [T]he same night[,] when I was putting her to bed[,] I asked her where she lived when her dad did this to her[.] ***

*** I asked her if she lived on West Olive or on West Washington, and she said both. And I said, 'You mean he did it two times?' " And she said, 'He did it lots of times at both houses.' "

McLaughlin added later that C.L. said that her mother was yelling " 'What are you doing to my baby' or *** 'Stop doing that to my baby.' " She added that C.L. never told her anything more specific, such as whether sexual penetration had occurred, and McLaughlin did not ask for further specifics.

Defendant testified that he never had any sexual contact with C.L. He claimed that they had a normal, close, loving relationship, and that sometimes she would kiss him "out of the blue" just to tell him that she loved him. He added that she had called him her "pony" because he gave her rides on his shoulders. He did not understand why she made the allegations that she had. He added that he rarely punished her, only making her sit down for a half hour to an hour as the most severe punishment. He claimed that he never spanked her or physically punished her.

Regarding the pornographic magazines, defendant claimed that he did not know the books were under his mattress when he signed the consent form. However, he admitted that he had found them there a few days before he was arrested as he looked for the soap opera digest that he kept under his mattress (even though he testified earlier that he could not read). He said that he saw the cover of a pornographic book but did not look inside. When shown the book at trial, he said, "I think it was this one, [but] I'm not for sure."

Defendant claimed that the magazines and book belonged to his wife's brother, Robert Arnold. Defendant explained, "He comes around [to my house] drunk, and he's got them with him in this little red bag. And he leaves them. I tell him not to leave them, you know. I don't want them around there. But he gets drunk, and he does that." Defendant added that he did not want them in his house because "I just don't believe in that kind of filth."

Defendant also testified that he willingly spoke to Fazio and consented to the search of his house because he did not remember that the magazines were under his mattress. He claimed that he had a memory disorder that caused him to unexplainably forget things "every couple days." He also denied accusing Fazio of planting the magazines and book in his bedroom, and claimed instead that, in a fit of anger, he merely told Fazio that he would sue Fazio if Fazio did not let him go.

Defendant's wife corroborated defendant's claim that her brother had left the pornographic material at their house when he was drunk. She testified that she had found them in her house and put them between the mattress and box springs of her bed. Although she claimed that she disliked pornography because it exploits women, she did not throw the magazine and book away because "[t]hey were [my brother's] property and I figured he'd be back and want them." She claimed also that her children had never seen the book or magazine because they could not go in her bedroom.

Mrs. Land also added that she never caught defendant molesting C.L., nor did she ever find him on top of her. She added that she and defendant had a good relationship. Indeed, she claimed that she—not defendant—mostly disciplined C.L., and that C.L. would go to defendant to get things when she would refuse. They also went on family outings frequently.

Based on the above evidence, the jury convicted defendant of all three counts of aggravated criminal sexual assault.

## II. Analysis

### A. *Hearsay Statements Admitted Pursuant to Section 115—10*

Because of the problems C.L. experienced testifying at trial, defendant's convictions depended in large part on the hearsay statements made by C.L. to Fazio, Quick, and McLaughlin. Defendant first argues that the trial court erred in admitting these statements under section 115—10 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). That section states the following:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out[-]of[-]court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out[-]of[-]court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, pars. 115—10(a), (b).

For clarity, we will detail the testimony presented at the section 115—10(b)(1) hearing because the trial court must determine whether the time, content, and circumstances provided sufficient safeguards of reliability based solely on the testimony presented at that hearing. See *People v. Back* (1992), 239 Ill. App. 3d 44, 47-51.

### 1. Testimony Presented at the Section 115—10 Hearing

At the hearing, the State called Fazio, Quick, and McLaughlin, who all testified that C.L. had told them that defendant had molested her. The State first called Fazio, who testified that he had previously talked to C.L. twice before about two other men who had molested her. On October 6, 1990, Quick reported to Fazio that C.L. had told Quick about her father also molesting her. Fazio thus spoke to C.L. that afternoon in an interview room at the Bloomington police station.

While Quick sat and listened to their conversation, C.L. told Fazio that she knew why she was there, and started telling Fazio that *three* men, including her father, had molested her. Regarding her father, C.L. said that he had engaged in sex with her, which she said had " 'hurt' " her. C.L. also said that her father had shown her dirty,

filthy books that made her cry. When she cried, her father spanked her.

Fazio added that he asked C.L. what she meant by "having sex," and C.L. told him about an incident that occurred on their couch in their home on Olive Street in Bloomington. While her father was " 'doing it,' " her Uncle Donnie knocked on the door. Her mother came down to answer the door and caught defendant having sex with C.L. Her mother started hitting her father and tried to pull C.L. out from under him. They then stood up, dressed, and answered the door.

Fazio continued that he used anatomically correct drawings of a naked male adult and a naked female child to help C.L. identify body parts and what she considered as "having sex." C.L. circled the male penis, which she called a "dick," and circled her vaginal area, saying that her father put his dick " 'inside' " her " 'tutu.' " Fazio asked her if any other contact occurred. She said it did, and circled the breasts on the female child drawing. She then circled the breasts of the male drawing, explaining, " 'Well, that happens when he lays on me.' " She also circled the mouth, saying that her father kissed her. Because she also had told Fazio that another of the men who had molested her had placed his penis in her mouth, he asked her if her father had done so, as well. She responded that her father had not.

Fazio initially did not remember her complaining about anal sex. However, after rereading his report, Fazio added that C.L. also demonstrated on the drawings and told him that her father had placed his penis in her anus, and that it also hurt.

On cross-examination, defense counsel attempted to prove that C.L. had confused her father with the other men who had molested her. Fazio testified that C.L. had since told him that a total of six men had molested her, including her father and her older brother. However, Fazio testified that he had opened the interview with a question asking C.L. if she knew why she was there and she responded, " 'Because of what I told Diane.' " When Fazio asked what she told Diane, C.L. responded " 'Dad has sex with me.' "

Regarding C.L.'s demeanor during the interview, defense counsel asked Fazio if she appeared emotionally distressed in any way. Fazio did not respond, and defense counsel followed up by asking if C.L. cried or asked for help from Quick, to which Fazio responded that she did not. Instead, Fazio testified that when C.L. remembered an incident, she appeared very sure of what she had said.

Fazio testified that C.L. could not specify any dates. He had estimated the dates on his report from the time periods in which she lived at the locations at which she claimed the sex had occurred.

Fazio concluded by clarifying that he generally conducted nonleading interviews in which he would let the child control the interview. If the child left certain things unaddressed or unclear, he would then ask for clarification, as he did with C.L., when he asked her what she meant when she said that her father had sex with her.

Quick testified to her background counseling troubled children and about what C.L. had told her about defendant. Quick testified that she began working with C.L.'s entire family and meeting with C.L. individually at the end of February 1990. Regarding C.L., teachers had reported that she frequently talked about blood and violence, wet her pants in school, and drew sexually explicit pictures with exaggerated bodily parts, including pictures with babies in her stomach.

Quick met with C.L. weekly from February 1990 to October 1990. She described the October 6, 1990, meeting with C.L. in which C.L. first told Quick about her father's molesting her. The subject came up during a conversation about their "journal-about-anything." As they spoke about some "good" pictures of insects that a friend of hers had shown her, C.L. noted how they differed from the "bad" pictures her father showed her. C.L. added that her father had sex with her after showing her the pictures, that it occurred at nighttime at their Washington Street address, and that her mother had held C.L.'s arms as she told C.L.'s father to "stop hurting her baby." She also told Quick that her uncle had knocked on the door, whereupon they stopped and pulled up their pants. However, C.L. did not use more specific terms than "sex," and Quick did not ask her to specify what she meant.

Quick indicated that C.L. spoke in an "echoic" manner when describing these things, meaning that C.L. would repeat, " 'he did bad stuff, he did bad stuff, he did bad stuff,' echoing her pattern of speech." Quick observed from this behavior and what C.L. said that C.L. felt scared to talk about it. She also related that as C.L. drew a picture about it, she broke three markers by pounding them against the paper.

Quick returned C.L. to her foster home, reported C.L.'s allegations to an Illinois Department of Children and Family Services (DCFS) social worker, and later brought C.L. to the police station to speak with Fazio. Quick then corroborated some of Fazio's testimony regarding what C.L. had told Fazio, particularly that C.L. had demonstrated what her father did by circling bodily parts on anatomical drawings.

However, instead of stating—as Fazio did—that C.L. appeared sure as she spoke, Quick testified that C.L. "appeared nervous and had trouble standing still." Quick said that C.L. also spoke in a echoic

manner when talking to Fazio. Quick also testified that C.L. gave long, extensive, and descriptive answers to Fazio's questions, and did not limit her answers to "yes" or "no."

McLaughlin also testified at the section 115–10 hearing. Similar to her testimony at trial described earlier, she testified that C.L. first told her about her father's molesting her on October 6, the same day C.L. spoke to Fazio and Quick. C.L. first told McLaughlin's daughter, who said to McLaughlin that C.L. " 'told me something that I think she needs to tell you about her mom holding her.' "

McLaughlin testified that C.L. then told McLaughlin about her father's molesting her, and that the molesting had occurred at both her home on Washington Street and her home on Olive Street. McLaughlin then asked C.L. if it had happened twice, and C.L. responded, " 'No, he did it lots of times at both houses.' " McLaughlin also testified that C.L. told her about the specific incident when her mother had tried to pull C.L. out from under her father as he " 'was doing bad things to me.' " McLaughlin added that C.L. did not use any terms more specific than "having sex," and that she tried not to ask C.L. for more specific details, even though C.L. had spoken about details in "street terms" when describing what other men had done to her.

About a month later, C.L. again talked to McLaughlin about C.L.'s father's molesting her. As it rained outside, C.L. spoke about a time when she ran with her father to the house of a family friend. McLaughlin asked C.L. if the person to whose house they ran had ever done anything to her, and C.L. responded that he had not done anything to her, unlike father, who had done bad things to her.

McLaughlin added that C.L. sometimes thereafter added clarifying details to what happened, such as that her mother said, "Stop hurting my baby," as she pulled on C.L.'s arms. McLaughlin also testified about how certain things or events would trigger C.L.'s memory, whereupon she would elaborate in great detail about what she remembered, likening it to a "flood of memor[ies]."

At the end of the hearing, defense counsel emphasized two factors in arguing that the time, content, and circumstances of C.L.'s statements did not provide sufficient safeguards of reliability. First, defense counsel argued that no inference should arise from C.L.'s vocabulary. Although defense counsel acknowledged that a seven-year-old using sexually explicit language can indicate that her allegations are true, here C.L.'s vocabulary instead came from the fact that other men—who had pleaded guilty at the time of this hearing to molesting C.L.—had molested C.L.

Second, defense counsel also emphasized the difference between Fazio's and Quick's descriptions of C.L.'s demeanor at the initial police station interview. Defense counsel admitted that this difference did not negate that C.L. actually said the words that comprised the allegations, but argued that it did negate the reliability of her allegations.

Based on the above evidence, the trial court found that the time, circumstances and content of what C.L. had told Fazio, Quick and McLaughlin all indicated the reliability of those statements. The trial court therefore held them all admissible under section 115—10 of the Code.

### 2. Analysis

#### a. Standard of Review

■ In *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1069, 580 N.E.2d 1367, 1375, this court held that a trial court's determination that out-of-court statements under section 115—10 of the Code were admissible would not be overruled unless that decision was "contrary to the manifest weight of the evidence." Similarly, the Fifth District Appellate Court held that this standard of review applies to section 115—10 cases. (*People v. McMillan* (1992), 231 Ill. App. 3d 1022, 1031, 597 N.E.2d 923, 928.) However, since *Deavers* and *McMillan*, the supreme court has stated that the standard of review of a trial court's decision to admit hearsay statements under section 115—10 does not differ from the standard of review generally applied to a trial court's decision on the admissibility of any evidence. (*People v. Zwart* (1992), 151 Ill. 2d 37, 44, 600 N.E.2d 1169, 1172.) In *Zwart*, the supreme court characterized a trial court's finding pursuant to section 115—10 as an ordinary evidentiary question and further stated that "questions regarding the admissibility of evidence lie within the discretion of the circuit court. A reviewing court may overturn a trial court's determination only when the record clearly demonstrates that the court abused its discretion." (*Zwart*, 151 Ill. 2d at 44, 600 N.E.2d at 1172.) Thus, we decline to apply the standard of review set forth in *Deavers* and *McMillan* and instead will apply the supreme court's standard set forth in *Zwart*.

#### b. Section 115—10 Hearsay

Admitting hearsay statements denies a defendant the opportunity to cross-examine the out-of-court declarant, thereby implicating the defendant's right to confront the witnesses against him. (See *People*

*v. West* (1992), 234 Ill. App. 3d 578, 585-88, 598 N.E.2d 1356, 1361-63; *People v. Coleman* (1990), 205 Ill. App. 3d 567, 579-84, 563 N.E.2d 1010, 1018-21.) Therefore, the standards regarding the right to confrontation provide guidance on how to interpret the requirement of section 115—10 of the Code that the trial court find that the time, content, and circumstances of the hearsay statements provide sufficient safeguards of reliability.

In *Idaho v. Wright* (1990), 497 U.S. 805, 814-15, 111 L. Ed. 2d 638, 651-52, 110 S. Ct. 3139, 3146, the United States Supreme Court held that incriminating hearsay statements made by a child victim of sexual abuse must meet two requirements before they are admissible: (1) in the usual case, the prosecution must either produce the declarant or demonstrate the declarant's unavailability; and (2) the statement must bear adequate "indicia of reliability." Such "indicia of reliability" can come from the statement's fitting into one of the firmly established hearsay rules or by "a showing of particularized guarantees of trustworthiness." *Wright*, 497 U.S. at 816, 111 L. Ed. 2d at 653, 110 S. Ct. at 3147.

The Court concluded that "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." (*Wright*, 497 U.S. at 819, 111 L. Ed. 2d at 655, 110 S. Ct. at 3148.) In particular, a court should not consider corroborating evidence when evaluating the facial reliability of the hearsay statements, but should solely evaluate the circumstances when the child-declarant made the statements. (*Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The Court listed some factors to consider when determining the reliability of such hearsay statements, including, but not limited to, (1) spontaneity and consistent repetition, (2) the mental state of declarant, (3) use of terminology unexpected of a child of a similar age, and (4) lack of motive to fabricate. *Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.

In *Coleman*, this court held the following regarding *Wright*'s impact on section 115—10 of the Code:

> "[T]he required finding [under section 115—10(b)(1)] that the statement provides 'sufficient safeguards of reliability' must be understood to be of a comparable nature with a finding that the circumstances of the statement render the declarant 'particularly worthy of belief' and, in reaching this decision, the court must consider only those circumstances which surround the making of the statement." *Coleman*, 205 Ill. App. 3d at 584, 563 N.E.2d at 1021.

In this case, defendant argues that the timing and content of the statements did not provide sufficient safeguards of reliability such that C.L.'s statements are particularly worthy of belief. Regarding the timing, defendant emphasizes both that C.L. made her allegations after eight months in a foster home and that C.L. did not mention her father's molesting her when she had previously reported that two other men had molested her. Regarding the content, defendant emphasizes that C.L. did not provide much specific information, nor could she provide any specific dates, even when asked to use holidays and birthdays for comparison. Indeed, Fazio admitted that he had compiled the dates in the charges based only upon when C.L. lived at the two addresses at which she claimed her father molested her. Defendant does not argue on appeal (as defense counsel argued at the hearing) that the purportedly inconsistent accounts of C.L.'s demeanor at the October 6, 1990, police station interview make her statement unreliable.

■ The State initially responds that defendant has waived any challenge to McLaughlin's testimony. At the section 115—10 hearing, defense counsel concluded her closing remarks by stating the following:

"With regard to the foster mother, [Wilma McLaughlin,] I don't have any reason to question the reliability of statements made to her, and I think in fact they are reliable."

We agree that defendant has thus waived any challenge to McLaughlin's testimony.

The State also argues that the defendant improperly raises on appeal different theories (as described above) concerning the unreliability of C.L.'s statements than the theories defense counsel argued at the section 115—10 hearing. We agree that doing so deprived the trial court of the opportunity to specifically address each of the claimed discrepancies, and thereby deprives us of the trial court's insight from its inherently better vantage point. Nonetheless, the testimony at the hearing revealed all these discrepancies. The trial court thus knew of them and tacitly rejected them by holding that the time, content, and circumstances provided sufficient safeguards of reliability. We cannot say that the trial court abused its discretion in so holding.

■ Regarding the timing, the purported eight-month delay in C.L.'s reporting of her father's actions does not inherently undermine the reliability of C.L.'s statement, especially in light of the fact that defendant was her father. (See *People v. Booker* (1992), 224 Ill. App. 3d 542, 552-54, 585 N.E.2d 1274, 1282-83 (hearsay statements reliable despite four-year delay, holding that "[p]romptness in reporting the

abuse is not an element of section 115—10").) First, the delay, if any, was *at most* eight months. C.L.'s family moved to Olive Street in February 1990, and C.L. told Fazio, Quick, and McLaughlin that the molesting occurred at both addresses in October 1990; therefore, the Olive Street incidents must have happened *within* eight months of C.L.'s first reporting them. On the other end of the spectrum, the shortest possible delay was two months, the time between C.L.'s moving to a foster home and her reporting the incidents.

Second, the jury knew of the delay and could fully assess its impact on C.L.'s credibility. The delay is an objective fact, the importance and impact of which do not depend on whether the statements come in through direct testimony or indirect hearsay testimony.

Third, the fact that defendant is C.L.'s father fully explains the delay. As opposed to a situation where a neighbor or a baby-sitter allegedly molests a child-victim, a child-victim's father ordinarily holds such an important and revered position in a child's life that the child victim of sex abuse rarely realizes that anything "bad" has happened; or, if the victim does realize it, a child's reporting that a parent has sexually abused him or her must be extraordinarily difficult and traumatic, given the almost certain family disruption that will surely follow. Accordingly, we do not find it surprising that C.L. first revealed such abuse in casual conversation with her counselor a few months after being separated from her family and placed in foster care.

Regarding the fact that C.L. did not mention her father when she reported the two other men, the jury could not assess the impact of this testimony because evidence of C.L.'s prior sexual activity—including the fact that others had sexually molested her—is inadmissible under the rape-shield statute. (See Ill. Rev. Stat. 1989, ch. 38, par. 115—7.) However, we do not find that this discrepancy inherently undermines the reliability of C.L.'s statements. We refuse to hold that child victims must report all incidents of sexual abuse at the same time or forever be barred from having the courts consider their subsequent allegations reliable or "particularly worthy of belief." Although a court should consider this factor's impact in the overall assessment of the reliability of a child-victim's allegations, this factor does not automatically render the statements inadmissible under section 115—10 of the Code. Here, the trial court did not find that this factor undermined the reliability of C.L.'s statement. We do not consider that decision an abuse of discretion.

Regarding the purported lack of specific details or dates in C.L.'s allegations, we disagree that these discrepancies exist. C.L. described to Fazio that defendant inserted his penis in her vagina and her anus

by circling those body parts on anatomical drawings and saying defendant hurt her by putting his penis "inside" her. Although more details might have further bolstered the reliability of C.L.'s statements, the details C.L. provided did make the statements sufficiently reliable.

Furthermore, because C.L. told Fazio, Quick, and McLaughlin that her father had sex with her at both her Olive Street and Washington Street residences, she did mark two time frames in which the events occurred. The State charged defendant only with two counts of vaginal sex based on these two time frames, even though C.L. vaguely told McLaughlin that defendant "did it lots of times at both houses." Thus, the lack of specific dates helped defendant more than it harmed him in that, first, their absence did not undermine the reliability of C.L.'s statements at all, and, second, their absence limited the State to merely two charges of vaginal sex and one charge of anal sex.

Finally, these purported discrepancies did not outweigh the other clear indicia of reliability, including but not limited to the following: C.L. appreciated the importance of the allegations; C.L. appeared disturbed to reveal this information, especially when talking initially to Quick; C.L. greatly trusted the people to whom she spoke; Fazio generally did not ask leading questions except to clarify details; C.L. described what happened without much prompting; and C.L. limited her allegations to anal and vaginal sex, even when specifically asked if defendant had inserted his penis in her mouth as other men had done. We also find her description of the one event that she did describe in detail—where her mother caught her father molesting her, started hitting her father, grabbed C.L.'s arms to pull C.L. out from under him, and shouted, "Stop hurting my baby"—especially vivid and facially reliable. These factors, dealing with the time, content, and circumstances of C.L.'s allegations, support the trial court's determination that the hearsay statements made by C.L. to Fazio, Quick, and McLaughlin provided sufficient safeguards of reliability. Therefore, we do not find that the trial court abused its discretion in admitting those statements under section 115–10 of the Code.

### B. *Insufficiency of the Evidence Regarding Two of Defendant's Convictions*

Defendant next argues that the State failed to prove him guilty of two of the three counts of aggravated criminal sexual assault because C.L. testified at trial that "he only did it one time" at their Washing-

ton Street address, and denied that she told Fazio or anyone else that it happened more than once. We disagree.

The Illinois Supreme Court has recently stated the following standard for reviewing the sufficiency of the evidence:

> "When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261[, 478 N.E.2d 267, 277]. This standard, derived from *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, does not require the court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " (Emphasis in original.) [Citation.] [Instead], the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261[, 478 N.E.2d at 277; citation].) \*\*\* The standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789[; citation].)" (*People v. Campbell* (1992), 146 Ill. 2d 363, 374-75, 586 N.E.2d 1261, 1265-66.)

Therefore, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Campbell*, 146 Ill. 2d at 375, 586 N.E.2d at 1266; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

■ Although defendant correctly points out that C.L. repeatedly testified at trial that "he did it only one time," defendant has selectively quoted from portions of C.L.'s testimony. As outlined above, C.L. had a very difficult time testifying. (At one point while on the witness stand, she turned her back to the courtroom, and the prosecutor needed to ask her to turn around.) In addition, C.L. retracted her statement that she told Fazio that it only happened once, and testified that the things she had told Fazio—as well as the things she had told her foster parents and Quick—*did happen*. C.L. also testified at trial that she did not make up stories about her father because she was mad at him. C.L.'s foster mother testified that C.L. could remember things well, but only when her memories were triggered by certain

events. Finally, the jury witnessed C.L.'s demeanor at trial, and could weigh her testimony along with the testimony of Fazio, Quick, and McLaughlin, who all testified that C.L. told them that defendant engaged in both vaginal sex and anal sex with her several times at both houses. Therefore, viewed in the light most favorable to the prosecution, the evidence at trial sufficiently supported all three of the jury's verdicts.

### C. *Evidence That Other Men Had Molested C.L.*

Defendant next argues that the trial court erroneously excluded all evidence that other men had molested C.L. The court based this ruling on the rape-shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115–7). Defendant attempts to distinguish this case from the ordinary case where a defendant might try to admit evidence of prior sexual activity by arguing that defendant here did not seek to introduce this evidence to show the victim's consent. Instead, defendant argues that the evidence was relevant to whether C.L. had confused defendant with another person. Defendant thus argues that "the trial court's ruling contravened the purpose of the rape[-]shield statute and violated defendant's constitutional right to present a defense."

■ In pertinent part, the rape-shield statute provides the following:

> "In prosecutions for *** criminal sexual assault, *** the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 115–7(a).)

The statute does not limit its protection to evidence of consent, but instead clearly bars the admission of prior sexual activity—except the prior sexual activity between the accused and the alleged victim—for *any* reason. (See *People v. Sandoval* (1990), 135 Ill. 2d 159, 170-71, 552 N.E.2d 726, 731; *People v. Bell* (1991), 217 Ill. App. 3d 985, 1004, 577 N.E.2d 1228, 1242.) We therefore reject defendant's attempt to narrowly construe the rape-shield statute as limited to prohibiting using the victim's prior sexual activity as evidence of consent.

■ Defendant also argues that excluding this evidence denied him his constitutional right to confrontation. (U.S. Const., amend. VI.) Initially, we question the likelihood that C.L. could have confused her own father with the other men who molested her. Moreover, defendant did not make an offer of proof by asking C.L. on the record (but away from the jury) whether she could have confused defendant with other men. Despite C.L.'s trouble testifying, she might have dispelled

any doubt over this purported confusion, especially outside the presence of the jurors, whose presence likely contributed significantly to C.L.'s discomfort on the witness stand.

Defendant's posture on appeal is to ask this court to reverse his conviction and remand for a new trial *in the hope* that C.L. at the new trial might reveal some confusion over whether her father sexually assaulted her, as did some other men. However, offers of proof are designed to eliminate such speculation and not only to give the trial court the opportunity to better understand the nature of the proffered evidence—and thereby reevaluate its prior ruling—but also to give courts of review the opportunity to see precisely the nature of the evidence the appellant complains the trial court improperly excluded. By failing to present an offer of proof on this point, defendant has waived this argument on appeal. In so holding, we are mindful of *People v. Andrews* (1992), 146 Ill. 2d 413, 420-21, 588 N.E.2d 1126, 1131, where the supreme court addressed the defendant's argument that the trial court wrongly excluded his proffered evidence and wrote the following:

> "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. [Citations.] The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and *to enable a reviewing court to determine whether exclusion of the evidence was proper.* [Citation.] The failure to make an adequate offer of proof results in a waiver of the issue on appeal." (Emphasis added.)

Because of defendant's failure to make an offer of proof at trial, this court cannot know the nature of the evidence defendant claims the trial court wrongly excluded. We decline to speculate what an offer of proof might have revealed; thus, we have no basis upon which to conclude that the trial court erred in depriving defendant of the opportunity to show the jury C.L.'s alleged confusion or uncertainty about who sexually assaulted her.

Defendant also argued at the trial level that he was concerned that the State would present a closing argument that C.L., a child of tender years, would have no other way to be acquainted with sexual terminology and experiences other than to have engaged in such acts with defendant. Defendant argued that such an argument by the State would mislead the jury because the court and parties knew that the other three men had pleaded guilty to sex offenses involving C.L.

In denying defendant's request to reveal C.L.'s sexual involvement with these other three men, the trial court acknowledged the

defendant's concerns regarding possible argument by the State about C.L.'s knowledge of sexual experiences and terminology. The court stated the following:

"If the State attempts to *** assert that the complaining witness wouldn't have *** knowledge of this, wouldn't use this terminology in some other fashion but for the defendant's activities, then it seems to me that the State has taken unfair advantage of the defendant, and at that point I'm going to have to look very carefully. [So] I'm trying to *** warn both of you ahead of time [about the State's doing so.]"

We believe the trial court appropriately handled this aspect of defendant's argument, and our review of the State's closing argument reveals that the argument the defendant was concerned about was never made. We also note that defendant never even raised this issue in his post-trial motion.

### D. *Jury Instruction on Mental State*

■ Defendant next argues that his conviction must be reversed because the jury instructions for criminal sexual assault did not include a mental state. However, defendant waived this issue for review because he failed to object at trial or in his post-trial motion. We also find that the instructions given do not constitute plain error. (See *People v. Smith* (1991), 209 Ill. App. 3d 1043, 1060, 568 N.E.2d 482, 493.) We have previously ruled that a mental state instruction is not required when instructing the jury on the elements of aggravated criminal sexual assault. *Smith*, 209 Ill. App. 3d at 1061, 568 N.E.2d at 493; *People v. Burton* (1990), 201 Ill. App. 3d 116, 122, 558 N.E.2d 1369, 1374.

### III. CONCLUSION

For the reasons stated, we affirm defendant's convictions.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.