2021 IL App (2d) 190960-U
No. 2-19-0960
Order filed December 17, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-524 |
| BRENNAN J. FARRIS, | ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The trial court did not err in admitting, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2016)), victim's out-of-court statements made during a forensic interview where the time, contents, and circumstances of the statements provided sufficient safeguards of reliability; (2) evidence was sufficient to prove defendant guilty beyond a reasonable doubt of two counts of anal penetration; (3) trial court properly denied defendant's motion to suppress potentially incriminating statements recorded during a consensual overhear; and (4) the trial court properly instructed the jury, per the applicable statute, that "sexual penetration" meant either "intrusion" or "contact," even though the indictment specified "intrusion," because the indictment's allegation of the specific manner of commission was surplusage, and thus the State remained free to prove either manner.

¶ 2    Following a jury trial in the circuit court of DeKalb County, defendant, Brennan J. Farris, was convicted of four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and sentenced to four consecutive nine-year prison terms. He now appeals, arguing that: (1) the trial court erred in admitting the victim's hearsay statements, made during a forensic interview, as substantive evidence under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)); (2) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of the two counts charging him with anal penetration; (3) the trial court erred in denying his motion to suppress potentially inculpatory statements recorded during a consensual overhear; and (4) he was denied a fair trial because the predatory criminal sexual assault charges alleging "intrusion" were expanded by the jury instructions to include the option to find guilt on evidence of mere "contact." We disagree with all of defendant's arguments and affirm.

¶ 3                          I. BACKGROUND

¶ 4    On August 24, 2015, defendant was charged by indictment with 17 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). Counts 1 through 4 of the indictment alleged that defendant knowingly committed acts of sexual penetration with A.F., a minor under the age of 13, in that between January 1, 2013, and July 21, 2015, defendant, an individual over the age of 17, placed his penis in the sex organ of A.F. Counts 5 and 6 of the indictment alleged that defendant knowingly committed acts of sexual penetration with A.F., a minor under the age of 13, in that between January 1, 2013, and July 21, 2015, defendant, an individual over the age of 17, placed his penis in the anus of A.F. Counts 7 through 17 of the indictment alleged similar conduct by defendant between January 1, 2007, and July 21, 2015, with respect to L.F., A.F.'s older half-sister.

¶ 5                                    A. Pretrial Proceedings

¶ 6        1. Motion to Admit Out-of-Court Statements Pursuant to 725 ILCS 5/115-10

¶ 7        Prior to trial, the State filed a notice pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)) to admit out-of-court statements of A.F. and L.F. as substantive evidence. Specifically, the State sought to admit: (1) statements L.F. made to Donna Moulton during a forensic interview at the Children's Advocacy Center (Advocacy Center) on July 14, 2015;[1] (2) statements A.F. made to Monique Heilemeier during a forensic interview at the Advocacy Center on July 20, 2015; (3) statements L.F. made to Darcy Mayry (L.F.'s mother) and Samantha Straka (Mayry's friend) on July 8, 2015; (4) statements L.F. made to Shannon Krueger (a sexual assault nurse examiner) on July 31, 2015; and (5) statements A.F. made to Nicole Albright (A.F.'s mother). Beginning on December 22, 2016, the trial court conducted a hearing on the State's motion. At that time, the State indicated that it would no longer seek to admit L.F.'s statement to Krueger, but would still seek to admit the other statements. Albright, Mayry, Straka, Heilemeier, and Moulton testified at the hearing. The evidence presented revealed in relevant part as follows.

¶ 8        On July 8, 2015, Mayry found an entry in the diary of L.F., her then 11-year-old daughter, that said that her dad (defendant) had raped her. A few hours later, Mayry and Straka asked L.F., who confirmed it was true. After initially telling Mayry that the abuse started when she was three years old, L.F. shut down and became reluctant to discuss the matter further with Mayry. L.F. then went into a bathroom with Straka and relayed details of the alleged abuse to Straka. Straka contemporaneously texted those details to Mayry. Over defendant's objection, the court granted

---

[1] The State's motion incorrectly specifies the date of Moulton's interview with L.F. as taking place on November 25, 2014.

the State's motion to admit the text messages. The messages said that L.F. tried to tell Albright, her stepmom, about defendant's conduct, but Albright did not believe her. The messages also said that when L.F. was "really really little" defendant "had [her] smoke weed" and told her that "he would give [her] 40 dollars if he could kiss [her]." When L.F. declined, defendant offered her $60, but L.F. again refused. The messages also said that defendant put his hands inside L.F.'s underwear, that he took off her pants, that he "put his dick down in no no places," and that "it happen[ed] more than once." Mayry contacted the authorities to report the allegations and scheduled an interview at the Advocacy Center.

¶ 9    After Mayry spoke to the authorities, the Illinois Department of Children and Family Services (DCFS) contacted Albright, the mother of two of defendant's other children, and told her not to allow her children to have contact with defendant. Albright then spoke to Mayry about the DCFS call. Following that conversation, Albright spoke to A.F., who was five years old at the time, and asked her if defendant had ever touched her. A.F. initially told Albright that she could not tell her anything because defendant told her that if she told anyone, he would move far away and never talk to her again. A.F. then told Albright that defendant "humped her." Albright did not ask any follow up questions. Subsequently, A.F. was interviewed at the Advocacy Center. A recording of the interview was admitted into evidence and played in court. We have reviewed the interview and describe it, pertinently, as follows.

¶ 10    During the interview, A.F. told Heilemeier that she was five years of age. A.F. also told Heilemeier where she went to school, her plans for the summer, who lived in her household, and the ages of her siblings. Heilemeier explained that her job is to "talk to kids" and ask "a lot of questions." Heilemeier told A.F. that if she asks her a question and A.F. does not know the answer, A.F. should state that she does not know and not to guess. Heilemeier further told A.F. that if she

does not understand a question, A.F. should ask her to repeat the question or tell her that she does not understand. In addition, Heilemeier instructed A.F. to correct her if she gets something wrong.

¶ 11   Heilemeier asked A.F. to tell her why she thought she was at the Advocacy Center. A.F. responded "because my daddy did stuff bad [*sic*] to me." Heilemeier then asked A.F. to tell her "everything" she knew "about that." A.F. stated that she went to defendant's house and defendant "stuck his private spot in [her] private spot" and that it felt "bad." The following colloquy then occurred:

> "Q.   When [defendant] did that, did he have clothes on or clothes off?
>
> A.   Clothes on.
>
> Q.   Clothes on. And how about you, did you have clothes on or clothes off?
>
> A.   Clothes on.
>
> Q.   Did that happen one time or more times?
>
> A.   Um. Two times.
>
> Q.   Two times. Two times in the same time? The same day? Or two times, one in a different day?
>
> A.   Um. Two times in the same day."

Heilemeier than asked A.F. to tell her "everything [she] remembers about that *** [s]tarting from *** what you guys were doing before it happened *** all the way through." A.F. stated that she did not know why defendant did it to her. Heilemeier asked if A.F. said anything to defendant. A.F. responded that she told him to stop but he "didn't stop. And then he said when [he's] done and then he didn't stop, he kept going and then he stopped." Heilemeier then asked as follows:

> "Q.   Do you remember what kind of clothes he had on?
>
> A.   Um.

> Q. No. Did he have on pants or shorts or something else?
>
> A. He had pants and a t-shirt on.
>
> Q. Pants and a t-shirt. What kind of pants?
>
> A. Like blue pants and a white t-shirt."

¶ 12 A.F. stated that she was at her grandma's house, where defendant lives, during the occurrences. A.F. stated that she was in defendant's room when they happened and described how the room is furnished. A.F. noted that the bedroom contained a table, a bed, pillows, and two blankets. She described one of the blankets as pink and white and the other as black. She also stated that defendant has cars to play with displayed under a television shelf. Heilemeier then asked:

> "Q. And is this daytime or nighttime that this happened?
>
> A. Um. Nighttime and um and morning time.
>
> Q. Nighttime and morning time, okay. What happened first, nighttime or morning time?
>
> A. Um. Morning and nighttime.
>
> Q. Morning and nighttime, okay. All right. Tell me about everything that happened at nighttime.
>
> A. Well he just stuck his privates. He did the same thing."

A.F. further stated that defendant's room had "one bed on the bottom and *** one bed on the top," but it was not a bunk bed. A.F. and defendant were on the "top bed." A.F.'s four-year-old sister was sleeping on the bottom bed. A.F. stated that defendant was laying down and she was on top of defendant. A.F. stated that defendant told her to get on top of him. Heilemeier asked A.F. to tell her "everything that happened, that [she] remember[ed]." A.F. responded, "Um, he's um, did this

thing that I told you already." A.F. reiterated that this occurred at "nighttime and morning time." Heilemeier asked A.F., "so when you said nighttime, did you already sleep or were you just getting ready to go to sleep?" A.F. responded, "[w]e were already. And then when he stopped we were just sleeping." Heilemeier asked A.F. what happened after defendant told her to get on top of him. A.F. responded that defendant "stuck his privacy in [hers]." The following exchange then occurred:

> "Q. Okay. When you said he stuck it in you, and you said you had clothes on, did anything happen to the clothes?
>
> A. Like what?
>
> Q. Like did they get pulled down or pulled away or taken off?
>
> A. They—they were on.
>
> Q. They were on the whole time?
>
> A. [Nodding].
>
> Q. Okay. And do you remember what you had on?
>
> A. Um. Shorts.
>
> Q. You had shorts on, okay. And are they like pajama shorts or just regular shorts that you wear for daytime too?
>
> A. They were, um, pajama shorts.
>
> * * *
>
> Q. And did [defendant] do anything with your clothes? Or did you do anything with your clothes, when he had you get on top of him?
>
> A. We just left them on."

¶ 13    Heilemeier than asked A.F. if defendant said anything to her when he "put his privacy in [her] privacy." A.F. responded in the negative. Heilemeier asked A.F. to repeat what she told defendant. A.F. stated that she asked defendant "can you please stop and then he didn't stop," but stated that he would stop when he was done. A.F. stated that defendant went to sleep after he was done and nothing else happened that night. Heilemeier then asked:

"Q.    Then tell me about the morning.

A.    He just did the same thing.

Q.    Were you asleep or awake when [defendant] did that?

A.    Um. *** One time I was asleep. And one, and I was, two times I was awake.

Q.    So, one time asleep, one time awake.

A.    Mhmm.

Q.    And two times awake. I'm sorry, you said two times, right?

A.    Yes.

Q.    Okay. So, was there another time after the nighttime and the morning?

A.    [Nodding.]

Q.    When was the other time?

A.    Um. When, when we went back home and then we went back to his house and then we, and then we did it again. But it was just morning time.

Q.    It was morning time, okay."

Heilemeier asked A.F. if she remembered when this happened. A.F. responded that it was the last time she visited defendant at his house, which was "two days ago."

¶ 14    Heilemeier then showed A.F. anatomically correct drawings of a female and a male. A.F. referred to female breasts as "nipples" and female genitalia as either a "tutu," "gina," or "privacy."

A.F. referred to the human buttocks as the "butt" and the male genitalia as a "wiener." Heilemeier asked A.F. which body parts she would not want others to touch. A.F. responded the "gina," belly button, eyes, and nipples. The following exchange then occurred:

"Q.      *** Okay. So the gina, the belly button, the nipples, or the eyes. Has anybody ever touched your gina?

A.      [Nodding].

Q.      Who touched your gina?

A.      My daddy.

Q.      And what did daddy touch your gina with?

A.      Um. His wiener.

Q.      His wiener. Did he touch on the skin or on top of clothes or something else?

A.      [Pointing to anatomical drawing of female.] Um. On this.

Q.      On this, okay.

A.      Um. But, but, um I had clothes on though.

Q.      You had clothes on. Was that a different time than we're talking about or the same time?

A.      The same time.

Q.      The same time, okay.

A.      A different time.

Q.      A different time?

A.      Wait. Maybe.

Q.      Did it happen at the same visit that you went to with daddy, the nighttime, the morning, and the morning. Or was it a different time, like a different visit.

A.      It was morning and morning time. And then it was nighttime when he did it and morning time and morning time.

Q.      Okay. And you said that you had clothes on and that daddy had clothes on. Has anybody ever touched your gina when it didn't have clothes on?

A.      Um. My daddy.

Q.      Your daddy touched your gina when it didn't have clothes on. What did your daddy touch your gina with?

A.      His wiener.

Q.      His wiener. Okay. Tell me everything about that.

A.      Um, um. I don't know.

Q.      Tell me where at.

A.      [Pointing to female anatomical drawing.]

Q.      Okay. Tell me where you were when it happened. Like where were you, were you at daddy's house, grandma's house, or someplace else?

A.      Um. Daddy's.

Q.      At daddy's house?

A.      No, at grandma's house.

Q.      Okay. And you said daddy and grandma live together, right? Okay. So, you were at grandma's house.

* * *

Q.      Okay. So tell me about when daddy touched your gina with his wiener. What room were you in?

A.      His room.

"Q.     His room. And where were you in the room?

A.     Um. On the bed.

Q.     On the bed. The same bed here, okay. And tell me everything you remember.

A.     I don't remember.

Q.     Okay. Tell me was it daytime or nighttime?

A.     It was nighttime and morning time.

Q.     Nighttime and morning time? And was anybody else there with you?

A.     No, it was just me and my sister.

Q.     Just you and your sister, okay.

A.     And daddy.

Q.     And daddy, okay. All right. And what did daddy have on?

A.     Um, clothes."

¶ 15     Heilemeier then asked A.F. what defendant's "wiener" looked like. A.F. stated that it was "white." Heilemeier asked A.F. if it was "hard" or "soft." She said it was "soft" and "hard." A.F. also indicated that "white stuff" came out of defendant's wiener, which defendant wiped off with some clothes. A.F. further told Heilemeier that defendant touched the "inside" of her "gina" with his "wiener." The following exchange then occurred:

"Q.     And did that happen one time or more times?

A.     Um. More times. Like two times.

Q.     Like two times. And you said the nighttime and the morning time? Did daddy say anything to you?

A.     Um, no.

Q.     And this time you told me that you were on top of daddy. Where were you—

> A.     No, he was on top of me.
>
> Q.     He was on top of you this time. For the *** two times that we're talking about now?
>
> A.     [Nodding]
>
> Q.     And when he was on top of you, what did he do?
>
> A.     Um, he had sex with me.
>
> Q.     He had sex with you? Tell me what sex is.
>
> A.     It's where you put your wiener in someone else and then you *** hump them."

A.F. stated that when defendant put his wiener inside her, it felt "bad" and "hurt." A.F. asked defendant to stop, but defendant said he would stop when he was done. After defendant finished, A.F. and defendant went to sleep.

¶ 16     Heilemeier told A.F. she wanted "to get everything right." She stated that A.F. told her about "the time that happened that was nighttime and then it happened in the morning and the morning" and "the two times that happened where [defendant] put his wiener in [A.F.'s] gina." Heilemeier asked A.F. if these were "separate" occurrences. A.F. asked Heilemeier the meaning of "separate." Heilemeier responded that "separate" means "a different time." A.F. then indicated these were separate occurrences. A.F. also stated that she was five years old when this happened.

¶ 17     Heilemeier asked A.F. if anyone had ever touched her on the butt. A.F. initially responded in the negative. The following exchange then occurred:

> "Q.     No? If somebody were to touch you on your butt, who could you tell?
>
> A.     Um. My mommy.
>
> Q.     Mhmm. Because nobody has the right to touch you on your butt. And if somebody else or if daddy ever try to touch you on your gina or your privacy again—

> A.       He, um, he touched me on my butt with his wiener.
>
> Q.       He touched you on your butt with his wiener? Was it on top of your skin or on top of your clothes?
>
> A.       [Pointing to anatomical drawing.]
>
> Q.       On top of your butt?
>
> A.       No, right here.
>
> Q.       Right there? Okay.
>
> A.       Inside of my butt.
>
> Q.       Inside your butt? Did that happen one time or more times?
>
> A.       [Holding up one finger]
>
> Q.       One time? And what did that feel like?
>
> A.       Or, actually two times."

A.F. further stated that it felt "bad" and that it "hurt" when defendant put his penis inside her anus. Heilemeier asked A.F. if defendant put anything on his "wiener" before he put it in her anus. A.F. responded that defendant put spit from his mouth on his penis. Defendant told A.F. that the spit would make it feel better, but A.F. said it did not. A.F. stated that the incidents in which defendant inserted his penis in her anus occurred at defendant's house and that the times defendant put his penis in her anus were "different times" than the occurrences when defendant put his penis in her vagina.

¶ 18      During the interview, A.F. referenced a woman named "Cindy":

> "Q.       All right, and then, you know how I told you we had cameras up here? Do you ever take pictures with anybody else?
>
> A.       At the dentist.

Q. At the dentist you take pictures?

A. And with my mommy.

Q. And with your mommy. What about at daddy's house, does anybody ever take pictures at daddy's house?

A. No.

Q. No.

A. Mommy takes pictures to for send it to Cindy [*sic*].

Q. Who's Cindy?

A. Um. Well, Cindy used to be my mom's friend, but now she's not because, um, she because daddy used to be my mom's um—just boyfriend and girlfriend.

Q. Okay.

A. 'Cause they're not, um, they're not um, husband and wife because *** husband and wife are *** married.

Q. Are married and they're not married.

A. Yeah.

Q. All right. Does anything else—

A. Yes. But now, now, um, daddy doesn't want to be mommy's, um, mommy's, um, boyfriend girlfriend anymore because they, um, 'cause they fight.

Q. All right.

A. But now he's, um, Cindy's, um, girlfriend boyfriend."

¶ 19    Near the end of the interview, the following exchange occurred:

"Q. So [A.F.], I just want to make sure I have everything right, okay. So you told me about one time you went to visit dad and something happened at the nighttime

and the morning and then another morning. And that was all at one time that you went to visit dad. And then you told me there was another time you went to visit dad where he put his wiener in your gina and also his wiener in your butt. How many times has dad put his wiener in your gina?

* * *

A.    Um, like two times, like when we went to his house.

Q.    Okay. And how about his wiener in your butt? How many times has he done that?

A.    Two times when we come to his house.

Q.    Okay. All right. Two times, wiener in gina, and then two times, wiener in the butt. And I know I asked you earlier if he put anything on his wiener before he put it in your butt. What about when he puts his wiener in your gina, does he put anything on his wiener when he does that?

A.    Um. Spit.

Q.    Spit. In the same way he did it when he put it in your butt?

A.    Mhmm.

Q.    And when he put it in your butt was he on top of you or beside you or something else?

* * *

A.    On top of me.

Q.    He was on top of you? When he's on top of you are you facing towards his face or away from his face?

A.    Away from his face.

Q.     Away from his face?

A.     Yeah.

Q.     Okay. And are you sitting, standing, or laying?

A.     Laying.

Q.     And when he put his wiener in your butt were you sitting, standing, or laying?

A.     Um. Um, laying.

*  *  *

Q.     All right, so I want to go back and I just want to make sure I get this just as right as I can. So, when you said that dad put his wiener in your gina two times and you told me about when he put his wiener in your butt two times, *** for the wiener in the gina was that two times on the same day or two times on a different day?

A.     Um. Two times.

Q.     Two times? Was it on the same day or a different day?

A.     A different day.

Q.     Okay. So one time on one day and another time on another day?

A.     [Nodding].

Q.     Okay. And what about the wiener in the butt, was that one time on a different day and one time on a different day, so two different days?

A.     [Nodding].

Q.     Okay. All right. I think that's all I have."

A.F. told Heilemeier that her grandma was at work when these incidents happened. A.F. further related that defendant told her not tell her mom what had happened or he would have to "move out very far and never see [his family] again." A.F. said it felt "bad" when defendant told her that.

¶ 20    At the hearing, Heilemeier initially testified regarding her training as a forensic interviewer. Heilemeier estimated that over a 10-year period, she has conducted 703 forensic interviews involving cases of child sexual and physical abuse. Heilemeier further explained that the methodology she uses to interview children is known as the RATAC method, which she described as a "semi-structured interview process that involves interviewing children in a neutral environment using nonleading and noncoercive questions." Heilemeier stated that the process involves five steps—rapport building, anatomy inquiry, touch inquiry, abuse scenario, and closure. Heilemeier testified that she interviewed A.F. at the Advocacy Center on July 20, 2015, using the RATAC method. Although Heilemeier was the only individual in the room with A.F. at the time of the interview, representatives from the Advocacy Center, DCFS, the DeKalb Police Department, and the State's Attorney's office observed the interview from another room and relayed questions to her via an earpiece. Heilemeier identified People's Exhibit No. 5 as a video copy of her interview with A.F. She also identified People's Exhibit Nos. 6, 7, and 8 as drawings used during the interview, including the anatomical drawings of the female and male human body.

¶ 21    On cross-examination, Heilemeier acknowledged that the interviewer is not supposed to lead during a forensic interview. She explained that the only time she asks a child a leading question is once the child has made a disclosure and additional information is needed. Heilemeier stated that her primary goal when doing a forensic interview is not to determine whether a child is being truthful or has been coached, but rather to "gather information for the investigation." Heilemeier admitted that during the interview, she asked A.F. on multiple occasions how many

times defendant's conduct occurred. She explained that, to a five year old, understanding exactly how many times something occurs is confusing. Nevertheless, she noted that A.F. corrected her multiple times during the interview when Heilemeier got information wrong regarding the number of times something happened. Heilemeier also testified that although A.F. indicated that she and defendant had their clothes on during one of the incidents, A.F. also indicated that there were multiple incidents of abuse and she was not wearing clothes during one of the incidents.

¶ 22    Eleven-year-old L.F. also presented for a forensic interview at the Advocacy Center. A video of L.F.'s interview was admitted into evidence. During L.F.'s interview, she said that defendant touched her initially when she was "really small" and she thought the last time he touched her was when she was eleven, perhaps three weeks or a month prior to the interview. L.F. said that during the most recent incident, she was playing video games in defendant's bedroom at the house he lived in with his mother when defendant tried to touch her vagina on top of her clothes. L.F. told defendant to stop, which he did, and then she left the room. L.F. said that situations like this had happened with defendant "a lot" before—more than 10 times but less than 50. L.F. said that, typically, when this happened she would be sleeping and would wake up with him touching her chest or her vagina. She would tell him to stop, and he would. L.F. also described an incident when she was "really little," perhaps "four or five" when she woke up with no clothes to defendant on top of her with no clothes, huffing and puffing and kissing her on the lips.

¶ 23    After hearing testimony and listening to argument, the trial court granted the State's motion as to A.F.'s and L.F.'s statements to the interviewers and to their mothers. Notably, the court determined that "the time, content and circumstances of the statements made by both minors provide[d] sufficient safeguards of reliability and, therefore, [they are] admissible pursuant to

statute." The court also indicated that the text messages between Straka and Mayry would be admissible if the State could lay a sufficient foundation.

¶ 24                                    2. Motion to Sever

¶ 25    After the trial court granted the State's motion to admit A.F.'s and L.F.'s out-of-court statements, defendant moved to sever the charges related to A.F. from the charges related to L.F. The State conceded that the charges should be severed, and the trial court severed the charges related to A.F. (counts 1 through 6) from the counts related to L.F. (counts 7 through 17). The instant case involves only the charges related to A.F.

¶ 26              3. Motion for Ruling on Admissibility of Other Crimes Evidence

¶ 27    The State filed a "Notice Pursuant to 725 ILCS 5/115-7.3 [725 ILCS 5/115-7.3 (West 2016)] and Motion for Ruling on Admissibility of Other Crimes Evidence." Specifically, the State sought to admit evidence related to A.F.'s allegations in L.F.'s case and vice-versa. At the hearing on the motion, the State argued that the events were close enough in time, similar in nature, involved similar victims, and, accordingly, should be admitted as more probative than prejudicial. The defense conceded factual similarity, but argued that the events were not temporally proximate. The trial court ruled that the State met its burden to show that the alleged incidents were sufficiently similar and that the evidence would be more probative than prejudicial.

¶ 28              4. Motion to Suppress Intercepted Communications

¶ 29    Prior to trial, defendant filed a "Motion Suppress [*sic*] Intercepted Communications and Evidence Discovered as a Result of Electronic Surveillance." In the motion, defendant sought to suppress phone conversations between himself and Mayry (L.F.'s mother) during which defendant made inculpatory statements that he had previously touched L.F. Defendant argued, *inter alia*, that the evidence should be suppressed because, in violation of section 108A-1 of the Code (725 ILCS

5/108A-1 (West 2012)), an assistant state's attorney, and not the elected state's attorney or an assistant state's attorney "authorized by the State's Attorney" had signed the overhear application.

¶ 30    During an evidentiary hearing on defendant's motion, Richard Schmack, the DeKalb County State's Attorney in 2015 testified. Schmack related that in 2015, Carrie Thompson worked in his office as an assistant state's attorney. According to Schmack, Thompson was authorized to assist police officers in obtaining overhears and had the authority to approve overhears and go with officers to obtain the order from a judge. Schmack further testified that he signed Thompson's oath of office when she was sworn in as an assistant State's Attorney. According to Schmack the oath of office authorized Thompson to "take actions on [his] behalf as an Assistant State's Attorney under [his] authority as State's Attorney." On cross-examination, Schmack acknowledged that Thompson, not he, signed the overhear application and that the signature line for the application identified Thompson as the "State's Attorney of DeKalb County." Schmack also acknowledged that he did not sign any document authorizing Thompson to apply for the specific order obtained in defendant's case. After hearing legal argument from the parties, the trial court denied the motion, citing Schmack's testimony that Thompson was authorized to participate in eavesdropping orders. The court allowed that the authorization was not written, but noted that the statute does not so require.

¶ 31                                    B. Trial Proceedings

¶ 32    The case proceeded to a jury trial beginning on October 23, 2018. In addition to A.F., the State called Heilemeier, Albright, Krueger, L.F., and a police detective who photographed defendant's residence. The State also published A.F.'s out-of-court statements to Heilemeier to the jury. Defendant did not testify on his own behalf, but did present testimony from Donna Farris (his mother) and Cindy Brown (the woman he was dating at the time of the alleged abuse of A.F.).

¶ 33    The testimony presented at trial revealed that defendant dated Albright and the pair lived together from 2007 until the end of 2014. Defendant's relationship with Albright produced two children, A.F. and another daughter. Late in 2014, defendant moved out of the family home and began dating Brown, the babysitter for Albright's and defendant's children. After defendant moved out of the home he shared with Albright, he moved into his mother's house. Defendant continued to see the children for occasional visitations, including overnight visits, on the weekends. According to Albright, even though she and defendant ceased their cohabitation arrangement and defendant began dating Brown, she and defendant continued to sleep together until defendant's arrest.

¶ 34    In July 2015, Albright received a phone call from DCFS telling her not to allow her children to visit defendant. Following the DCFS call, Albright contacted Mayry, the mother of two of defendant's other children, including L.F. Albright then asked her children if defendant had ever touched them. A.F. initially said that she could not tell Albright because defendant told her that he would have to move far away and never talk to her again if she ever told anyone. Subsequently, A.F. told Albright that defendant "humped her." Albright then arranged for A.F. to be interviewed at the Advocacy Center. Albright denied explaining things to A.F., helping her remember what happened, or telling A.F. what to say at the Advocacy Center interview other than that she should speak the truth. Albright also denied making up the story of A.F.'s abuse by defendant because she was upset with him.

¶ 35    Heilemeier interviewed A.F. during her visit to the Advocacy Center on July 20, 2015. Heilemeier utilized a "semi-structured interview process *** called RATAC" when she interviewed A.F. with the goal of providing the child with a "neutral, safe environment." Although Heilemeier was alone with five-year-old A.F. in the room while she conducted the interview, other

members of a "multi-disciplinary team," which included a police detective, an assistant state's attorney, and an official with DCFS, participated in the interview. As part of the interview process, Heilemeier met with police and other investigators prior to meeting A.F. and learned that A.F. had previously informed her mother that defendant had "humped her." The other members of the interview team then observed the interview from behind a one-way mirror and relayed questions to Heilemeier via an earpiece.

¶ 36    Heilemeier stated that the Advocacy Center's "philosophy" is to "try not to ask any leading questions" so as to avoid planting seeds in the subject's head. Heilemeier described herself as strictly an interviewer trying to "understand the information and gather as much as [she] can so that we can possibly have a better idea of what exactly happened and when it happened." In addition, Heilemeier specifically disclaimed any effort on her part to attempt to determine if A.F. told her the truth during her interview or to "ask that question." Nor did the protocol Heilemeier utilized make any effort to evaluate or determine A.F.'s credibility, whether she was "lying or not," or if her parents attempted to or did manipulate her. Heilemeier stated that it is the investigator's job to follow up on information gathered in the interview to determine credibility.

¶ 37    Heilemeier estimated that most of the questions she asked A.F. during the first half of the interview were her questions and that the final half or quarter of the questions she asked A.F. were supplied by the members of the multi-disciplinary team, "[e]specially follow-up questions." A video recording of Heilemeier's interview with A.F., the pertinent parts of which are reproduced above, was played for the jury. Heilemeier acknowledged that A.F. states in the video that no one had ever touched her on her butt. Heilemeier explained, however, that to a five-year-old child, "touching usually indicates hands."

¶ 38    A.F., who was eight years old at the time of defendant's trial, testified that defendant is her dad, and that, when she was little, she lived with defendant, Albright (her mother), and two of her sisters. At some point, defendant stopped living with the family and moved in with his mother. After defendant moved out, A.F. would still visit him every few weeks at the house where he lived and spend the night. When A.F. spent the night at defendant's home, she would sleep in the same room with him. Defendant had a trundle bed. Typically, defendant would sleep on the top bed and A.F. and her sister would sleep on the lower, pull-out bed. However, A.F. would sometimes sleep with defendant on the top bed.

¶ 39    A.F. further testified that there was a time when she visited defendant's house and he touched her in a way that she did not like. Specifically, defendant touched her private part, or vagina, with his private part, or penis. A.F. asked defendant to stop, but he did not. A.F. said this happened on the top bed in defendant's bedroom, it happened more than one time, and it happened on different days. A.F. stated that when defendant's penis touched her vagina it did not feel good. A.F. also stated that defendant did not touch any other part of her that she did not like. A.F. did not tell anyone about what happened to her at first because defendant told her not to. However, A.F. eventually told her mom about it after her mom asked her a question. A.F. further testified that she told the truth to Heilemeier during the forensic interview.

¶ 40    On cross-examination, A.F. testified that her mother has been helping her remember what defendant did to her by "explaining it to [her]." Specifically, A.F. recalled that her mother told her that defendant "hurt [her]." A.F. denied that anything she said in the video were things that her mother told her. A.F. further testified that her mother was upset with defendant because he and Brown, A.F.'s former babysitter, "got together." However, A.F. denied that her mother talked about defendant's and Brown's relationship when she reminded A.F. what happened. She also

testified that defendant's body touched the "outside" of her vagina and that defendant's body parts did not go inside of her. When asked if her clothes were on or off when defendant's alleged conduct occurred, A.F. initially stated that her clothes were off. However, after defense counsel referenced the Advocacy Center interview, A.F. stated that both her clothes and defendant's were on. A.F. also reiterated that defendant touched her vagina with his "wiener," but that was the only part of her body that defendant touched.

¶ 41 On redirect examination, A.F. stated that she knew the difference between the truth and a lie. She stated that her trial testimony about defendant touching her in a way she did not like was the truth. She further testified that her statements to Heilemeier during the forensic interview were the truth. On recross-examination, the following exchange occurred between A.F. and one of defendant's attorneys:

> Q. And part of the truth that you spoke on the video, that came from what your mommy told you; right?
>
> A. No.
>
> Q. But you said before that your mommy helped you to remember things you couldn't remember or told you things that happened; is that true?
>
> A. She didn't tell me everything.
>
>                               * * *
>
> Q. So some of the things that your mommy told you, those things you said on the video; is that correct?
>
> A. Yes.
>
> Q. And some of the things your mommy told you helped you remember things that you didn't remember; correct?

A.      Yes."

¶ 42    Shannon Krueger, a certified pediatric nurse practitioner, testified that she is the director of and a medical provider at the University of Illinois College of Medicine MERIT (Medical Evaluation Response Initiative Team) program. Krueger is also a sexual assault nurse examiner for pediatrics. On July 22, 2015, Krueger conducted a medical examination of A.F.[2] Krueger testified that A.F. had a history of constipation which is consistent with young victims who disclose anal penetration. A.F. had a normal hymenal and anal examination, *i.e.*, there was no evidence indicating a penetrating injury. Krueger testified that hymenal and anal tissue usually heals with no evidence of scarring in three to five days. Krueger noted that the absence of a visible injury does not rule out sexual abuse. On cross-examination, Krueger testified that available statistical data indicated that less than one percent of prepubescent children who disclose sexual abuse are not telling the truth. Based upon her review of A.F.'s statements during her interview with Heilemeier and examination of A.F., Krueger opined that A.F. had been sexually abused despite the absence of persistent medical findings.

¶ 43    L.F., defendant's then 14-year-old daughter, also testified in the State's case-in-chief. L.F. testified that beginning at a time when she was too little to remember, defendant touched her on the vagina with his hand in a way that she did not like, including touching her skin at times. She said this happened "often" and as recently as June 2015. She told the jury that these incidents would happen at night and that she would awaken to defendant touching her as she laid next to him in whatever bed she happened to be in. The touching happened both over and under her

---

[2] During Krueger's testimony, the examination date was initially misidentified as January 22, 2015.

clothing and on the inside and outside of her body. L.F. also told the jury how her mother found out about this when she read L.F.'s journal and found an entry that said that her dad "raped her."

¶ 44    Sergeant Paul Mott of the DeKalb Police Department testified that in July 2015, when he was a detective, he was assigned to a case involving A.F. On July 23, 2015, Mott and his partner, Detective Mark Nachman, went to defendant's residence to speak with Donna Farris (defendant's mother) and take photographs of the exterior of the residence and of defendant's bedroom. Following Sergeant Mott's testimony, defendant moved for a directed finding. The trial court denied the motion.

¶ 45    Donna Farris (Farris), defendant's mother, and Cindy Brown, defendant's ex-girlfriend, both testified for the defense.[3] Farris testified that during the time when defendant lived at her home, she typically worked Tuesday through Friday from 4 p.m. until 2 a.m. Farris said that the grandkids only visited on the weekends, so she was there every time A.F. was over during 2015 and that lots of people were around during that time, including Brown. Farris said during those times, defendant and Brown would sleep in the bedroom and the kids would sleep in her bedroom or on the couch. She said that due to her unusual work schedule, she would often stay up late and was usually the last person awake when the children were there. Farris told the jury she never heard any children screaming or crying or saying "stop" or anything of the sort. Nor did Farris remember a time when A.F. seemed quiet, reserved, or upset during any of her visits.

¶ 46    Brown provided testimony that was consistent with Farris and said that it was not possible that she fell asleep and defendant then abused the children in the bed she slept in.

---

[3] For clarity, all subsequent uses of "Farris" are references to defendant's mother, Donna Farris.

¶ 47    The parties agreed on the jury instructions with the exception of the proper way to instruct the jury under IPI 11.65E as to how to define sexual penetration. The State asked the trial court to instruct the jury that "sexual penetration" included both "any *contact*, however slight, between the sex organ or anus of one person and the sex organ of another person *or intrusion*, however slight, of any part of the body of one person into the sex organ of another person including, but not limited to cunnilingus or anal penetration." (Emphasis added.) Defendant argued that the instructions should not include the reference to "contact" because the indictment specifically charged defendant with placing his penis *in* A.F.'s anus and vagina. The trial court rejected defendant's argument and included "contact" in the definition of sexual penetration, reasoning that the indictment's specifications of intrusion was mere surplusage and the State could prove penetration by either contact or intrusion.

¶ 48    Following deliberations, the jury found defendant guilty on four counts of predatory criminal sexual assault—placing his penis in A.F.'s sex organ on two occasions and in her anus on two occasions—and not guilty on two counts of predatory criminal sexual assault that charged him with placing his penis in A.F.'s sex organ on two additional occasions.

¶ 49    Thereafter, defendant filed a motion for a new trial, challenging, *inter alia*, the sufficiency of the evidence, the admission of A.F.'s forensic interview with Heilemeier, the jury instructions, and the trial court's ruling on the admissibility of the overhear between him and Mayry. Following argument, the trial court denied defendant's motion in its entirety. Subsequently, the trial court sentenced defendant to 9 years' imprisonment on each count, with the sentences to be served consecutively, for a total of 36 years' imprisonment. This appeal followed.

¶ 50                                    II. ANALYSIS

¶ 51    On appeal, defendant raises four issues. Defendant claims that the trial court erred in admitting as substantive evidence pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)) the statements A.F. made during the Advocacy Center interview with Heilemeier. Defendant also argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of the two counts of anal penetration because the State's case on those counts rested entirely on A.F.'s "otherwise unreliable out-of-court statement, which A.F. contradicted at trial." In addition, defendant contends that the trial court erred when it denied his motion to suppress the recordings of the phone calls between himself and Mayry because the application for the overhear did not comply with the statutory requirements. Finally, defendant maintains that he was denied a fair trial because the predatory criminal sexual assault charges alleging "intrusion" were expanded by the jury instructions to include the option to find him guilty based on evidence of "mere 'contact.' " We address each contention in turn.

¶ 52                    A. Admission of Out-of-Court Statements

¶ 53    We first address defendant's claim that the trial court erred in admitting as substantive evidence pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)) the statements A.F. made during her forensic interview with Heilemeier. Defendant argues that the time, contents, and circumstances of the interview did not provide sufficient safeguards of reliability. He further contends that Heilemeier failed to encourage A.F. to be truthful or to explore the reliability of her statements and, instead, used improper techniques and cooperated with law enforcement agents to manipulate and change A.F.'s account of the incidents. As such, defendant claims that the State failed to carry its burden of establishing that the statements were reliable and not the result of adult prompting or manipulation.

¶ 54 The State responds that the trial court did not err in admitting the statements A.F. made during the forensic interview. According to the State, a review of the totality of the circumstances surrounding A.F.'s statements to Heilemeier, including the timing of A.F.'s disclosures, A.F.'s use of terminology and references to sexual activity unexpected of a child her age, as well as the absence of any evidence of a motive to fabricate affirmatively demonstrate the reliability of A.F.'s statements. The State further posits that, contrary to defendant's assertions, the record does not show that Heilemeier used improper techniques during her interview with A.F. or that A.F.'s statements were the product of adult prompting or manipulation. As such, the State maintains that the trial court did not abuse its discretion in admitting A.F.'s out-of-court statements to Heilemeier pursuant to section 115-10 of the Code.

¶ 55 An out-of-court statement offered to prove the truth of the matter asserted is hearsay. Ill. R. Evid. 801(a), (c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible at trial because it denies a defendant the opportunity to cross-examine the out-of-court declarant, thereby implicating the defendant's right to confront the witnesses against him or her. *People v. McLaurin*, 2015 IL App (1st) 131362, ¶ 42; *People v. Land*, 241 Ill. App. 3d 1066, 1079 (1993). Section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)) provides an exception to the hearsay rule for certain out-of-court statements made by a victim under age 13 in a child sexual offense case. Under the statute, admissible testimony includes "testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another" and "testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(1), (a)(2) (West 2016). The testimony may be admitted only if the trial court finds at a hearing conducted outside the jury's presence that the time, content,

and circumstances of the statement provide sufficient safeguards of reliability, and, as relevant here, the child testifies at the proceeding. 725 ILCS 5/115-10(b) (West 2016). "Among the factors to be considered in making a reliability determination are (1) the child's spontaneity and consistent repetition of the incident, (2) the child's mental state, (3) use of terminology unexpected of a child of a similar age, and (4) the lack of motive to fabricate." *People v. Cookson*, 335 Ill. App. 3d 786, 791 (2005). The trial court must evaluate the totality of the circumstances surrounding the child's making of the hearsay statement. *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 242. Moreover, cases involving the determination of the reliability of section 115-10 statements are fact specific and the holdings in each case are *sui generis*. *Burgund*, 2016 IL App (5th) 130119, ¶ 243; *People v. Edwards*, 224 Ill. App. 3d 1017, 1026 (1992).

¶ 56    In analyzing the trial court's ruling under section 115-10 of the Code, our focus is only on the testimony admitted at the pretrial hearing rather than the evidence presented at trial. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 85; see also *Land*, 241 Ill. App. 3d at 1075 (noting that the trial court must determine whether the time, content, and circumstances provided sufficient safeguards of reliability based solely on the testimony presented at the section 115-10 hearing). The State, as the proponent of the out-of-court statements sought to be admitted, bears the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation. *People v. Zwart*, 151 Ill. 2d 37, 43 (1992); *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009). A trial court has wide discretion in determining the admissibility of hearsay statements pursuant to section 115-10 of the Code, and a reviewing court will not disturb the trial court's finding absent an abuse of that discretion. *People v. Bowen*, 183 Ill. 2d 103, 120 (1998); *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57. An abuse of discretion occurs where the trial court's determination is arbitrary,

fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *Applewhite*, 2016 IL App (4th) 140558, ¶ 57.

¶ 57 After reviewing the relevant portions of the record, including the transcript of the testimony at the section 115-10 hearing and the video recording of the forensic interview, we conclude that the trial court did not abuse its discretion in admitting A.F.'s out-of-court statements to Heilemeier. With respect to the issue of timing, the record establishes that A.F.'s disclosure was made shortly after an allegation by L.F. (A.F.'s older, half-sister) that defendant had sexually abused her starting when L.F. was a young child. Upon learning of L.F.'s allegations, Albright asked A.F. whether defendant had ever touched her. A.F. initially told Albright that she could not tell her anything because defendant stated that if she told anyone, he would move far away and never talk to her again. A.F. then told Albright that defendant "humped her." Albright did not inquire any further and contacted the Advocacy Center for an interview. At the Advocacy Center, A.F. told Heilemeier that defendant did "stuff bad [*sic*]" to her multiple times, including that he "stuck his private spot in [her] private spot," touched the "inside" of her "gina" with his "wiener," "stuck his privacy in [hers]," had sex with her, and touched the "inside" of her "butt" with his "wiener."

¶ 58 It is not clear precisely how much time elapsed between the dates of the offenses and A.F.'s statements to Heilemeier. During the interview, A.F. indicated that the incidents occurred when she was five years old (her age at the time of the interview) and that one of the incidents occurred two days prior to the interview. Heilemeier's interview was on July 20, 2015, and the record discloses that A.F. turned five 7½ months earlier. Thus, the delay was as little as a couple of days and at most 7½ months (the time between A.F.'s fifth birthday and her interview with Heilemeier). Even if the reporting delay is towards the higher end of the range, our supreme court has stated that, as a general rule, a delay in reporting abuse will not automatically render a victim's statements

inadmissible under section 115-10. *Zwart*, 151 Ill. 2d at 46; see also *Sharp*, 391 Ill. App. 3d at 956 (noting that a delay in reporting an assault or initial denials of an assault will not automatically render a victim's statements inadmissible under section 115-10 of the Code); *People v. Jahn*, 246 Ill. App. 3d 689, 704 (1993) (noting that although spontaneity may be considered a factor in considering the reliability of a victim's statements, section 115-10 does not require that the sexual conduct be reported promptly in order for the statements to be admissible). Indeed, courts have determined that delays longer than the one here did not render a child's out-of-court statement unreliable. See, *e.g.*, *Bowen*, 183 Ill. 2d at 120 (three-year delay); *Land*, 241 Ill. App. 3d at 1081 (delay of up to eight months); *People v. Booker*, 224 Ill. App. 3d 542, 552-54 (1992) (four-year delay).

¶ 59    Moreover, the fact that defendant is A.F.'s father explains the delay. As one court has commented:

> "As opposed to a situation where a neighbor or a babysitter allegedly molests a child-victim, a child-victim's father ordinarily holds such an important and revered position in a child's life that the child victim of sex abuse rarely realizes that anything 'bad' has happened; or, if the victim does realize it, a child's reporting that a parent has sexually abused him or her must be extraordinarily difficult and traumatic, given the almost certain family disruption that will surely follow." *Land*, 241 Ill. App. 3d at 1082.

In this case, A.F. told Heilemeier that defendant told her not to tell her mom what he did or he would "move out very far and never see [his family] again." A.F. made a consistent, similar remark to Albright when Albright asked A.F. if defendant had ever touched her. Further, A.F. told Heilemeier that defendant's statement made her feel "bad." Given this record, any purported delay in A.F. reporting defendant's acts does not detract from the reliability of A.F.'s statements to

Heilemeier. See *Land*, 241 Ill. App. 3d at 1081-82 (holding that purported eight-month delay in minor reporting that her father molested her did not undermine the reliability of the minor's statement, especially given that the defendant was her father); *Booker*, 224 Ill. App. 3d at 552-54 (holding that hearsay statements were reliable despite four-year delay since promptness in reporting abuse is not an element of section 115-10).

¶ 60    The detail and content provided by the then five-year-old A.F. in her interview with Heilemeier, the terms and language used by A.F., and her unexplained knowledge of sexual matters, also support the trial court's finding of reliability. For instance, A.F. was able to provide specific details about defendant's bedroom where the abuse was alleged to have occurred. A.F. described defendant's bed, the bedding, and the contents of the room. Further, A.F. described the positions of her body and defendant's body when defendant placed his penis in her vagina and in her anus. A.F. identified male and female body parts using anatomical charts. More significantly, A.F.'s statements reflected a knowledge of sexual matters unusual for a child of her age. A.F. stated that defendant had "sex" with her and explained the act to Heilemeier. A.F. described defendant's "wiener." She also stated that she observed "white stuff" come out of defendant's "wiener," which defendant wiped away with some clothes. In addition, A.F. indicated that defendant put spit from his mouth on his penis before putting it in her vagina and anus. A.F. stated that while defendant told her the spit would make it feel better, it did not. Given this record, the content and details of the statements A.F. made to Heilemeier supported their reliability. See *Zwart*, 151 Ill. 2d at 44 (holding that content of three-year-old victim's statements supported their reliability where they reflected a knowledge of sexual activity which is unexpected and unusual for a child of that age).

¶ 61    Similarly, the circumstances surrounding the making of A.F.'s statements to Heilemeier supported their reliability. In this regard, the record reveals that after A.F. disclosed to her mother (Albright) that defendant had "humped her," she was not questioned further by Albright and was taken for a forensic interview. Within a couple of days of the disclosure, Heilemeier interviewed A.F. at the Advocacy Center. Heilemeier received training as a forensic interviewer and has performed more than 700 such interviews. Heilemeier testified that she used the RATAC methodology, a semi-structured interview process, while questioning A.F. Under this method, children are interviewed in a neutral environment using nonleading and noncoercive questions. Heilemeier stated that leading questions are not used except when a child discloses something that requires additional information.

¶ 62    As for the interview itself, the record establishes that Heilemeier began by talking to A.F. about her school, her summer plans, her family, and her home, thereby establishing a rapport with the child. Heilemeier then explained to A.F. that her job requires her to "talk to kids" and ask "a lot of questions." Heilemeier told A.F. that if she asks her a question and she does not know the answer, A.F. should not guess, but indicate that she does not know the answer. Heilemeier further told A.F. that if she does not understand a question, A.F. should ask her to repeat the question or tell her that she does not understand. In addition, Heilemeier told A.F. to correct her if she gets something wrong. That A.F. understood these instructions is apparent from a review of the video, during which A.F. corrects Heilemeier multiple times, indicates that she does not know or remember the answer to certain questions, and asks for the definition of a word (separate) with which she is not familiar. Furthermore, the video demonstrates that Heilemeier generally asked A.F. open-ended questions. For instance, she initiated questioning by asking A.F. why she thought she was at the Advocacy Center. She then expanded on A.F.'s response by asking A.F. to tell her

"everything" she knew "about that." Heilemeier used a similar approach multiple times during the interview. Indeed, defendant concedes that Heilemeier's initial questions, which were open-ended, elicited statements from A.F. that defendant sexually assaulted A.F. To the extent that Heilemeier resorted to leading questions, she did so only to clarify details. This does not render the interview unreliable. See *Sharp*, 391 Ill. App. 3d at 956; see also *Zwart*, 151 Ill. 2d at 55 (Freeman, J., dissenting) (citing *Idaho v. Wright*, 497 U.S. 805, 818-19 (1990) (citing J. Myers, Child Witness Law & Practice § 4.5, at 129-34 (1987))) (stating that even if leading questions are used, if appropriate, that fact does not necessarily render the responses untrustworthy).

¶ 63    Defendant suggests that A.F. had a motive to fabricate her claims to please Albright, her mother, due to allegations of "domestic strife" between him and Albright. In support, defendant refers to statements A.F. made during her interview with Heilemeier regarding the relationship between him, Albright, and Brown. A.F. stated that Brown (defendant's girlfriend at the time) "was supposed to be [Albright's] friend, but now she's not because *** [defendant] used to be [Albright's] just boyfriend and girlfriend." A.F. further remarked that defendant does not want to be Albright's girlfriend anymore because they fight. According to defendant, these statements suggest a motive to fabricate, so Heilemeier should have followed up on A.F.'s statements and asked A.F. if her parents ever fought in front of her, if Albright ever told her about being angry at him, and "any other questions related to [Albright's] attitude towards him." The trial court rejected defendant's claim that A.F. had a motive to fabricate. The court noted that defendant presented no evidence on this point. We agree with the trial court. A.F.'s statements regarding the relationship between defendant, Brown, and Albright were spontaneous. They arose after Heilemeier asked A.F. whether she takes pictures with anyone. In response, A.F. indicated that Albright takes pictures of her to send to Brown. There is no suggestion in A.F.'s statements that she was motivated

to lie or that she was coached by Albright to fabricate the allegations against defendant due to any animosity between Albright and Brown. To the contrary, there was evidence that A.F. delayed reporting defendant's acts because defendant told her that if she disclosed them, he would "move out very far and never see [his family] again." As such, we cannot say that the trial court's finding that A.F. had no motive to fabricate her claims against defendant was erroneous. As such, this further weighs in favor of the reliability of A.F.'s interview with Heilemeier.

¶ 64    In short, considering the totality of the circumstances surrounding A.F.'s statements to Heilemeier, the trial court did not abuse its discretion in finding that the State met its burden of proving that the time, content, and circumstances of A.F.'s statement to Heilemeier provided sufficient safeguards of reliability for admission pursuant to section 115-10 of the Code.

¶ 65    Despite the foregoing, defendant contends that the trial court's findings that the time, content, and circumstances surrounding A.F.'s out-of-court interview statements to Heilemeier did not establish the requisite indicia of reliability to be admissible as substantive evidence. In support of his position, defendant first points to alleged inconsistencies between A.F.'s statements to Heilemeier and A.F.'s trial testimony. However, defendant's citation to A.F.'s trial testimony is misplaced. As noted above, in determining the admissibility of A.F.'s statements to Heilemeier under section 115-10 of the Code, we focus only on the testimony admitted at the pretrial hearing rather than the evidence presented at trial. *Stull*, 2014 IL App (4th) 120704, ¶ 85; *Land*, 241 Ill. App. 3d at 1075; see also *People v. Back*, 239 Ill. App. 3d 44, 57 (1992).

¶ 66    Defendant also faults Heilemeier for purportedly doing "little to encourage A.F. to be truthful or to explore the reliability of her statements." However, neither the video recording of Heilemeier's interview with A.F. nor Heilemeier's testimony at the section 115-10 hearing support defendant's position. It is true that Heilemeier did not expressly ask A.F. if she knew the difference

between the truth and a lie. However, defendant does not cite any authority that such inquiry is required for the victim's testimony to be considered reliable under section 115-10 of the Code. In any event, Heilemeier prefaced the interview with instructions intended to ensure that A.F.'s responses were truthful and reliable. As noted previously, Heilemeier told A.F. that if she asks her a question and she does not know the answer, A.F. should not guess, but indicate that she does not know the answer. Heilemeier also told A.F. that if she does not understand a question, A.F. should ask her to repeat the question or tell her that she does not understand. Moreover, as discussed above, that A.F. understood these instructions is apparent from a review of the video during which A.F. corrects Heilemeier multiple times, indicates that she does not know or remember the answer to certain questions, and asks for the definition of a word (separate) she does not understand. A.F.'s conduct negates any suggestion that A.F.'s allegations were influenced by an outside source. Further, as noted earlier, Heilemeier used open-ended and multiple-choice questions during the interview, resorting to leading questions only to follow up for more information after a child has made a disclosure. Thus, defendant's claim that Heilemeier did "little to encourage A.F. to be truthful or to explore the reliability of her statements" is not well taken.

¶ 67     Defendant also claims that Heilemeier used "improper techniques and cooperated with law enforcement agents to manipulate and change A.F.'s account of the incident." Defendant asserts that in her initial disclosure, A.F. said that both she and her father had their clothes on during the alleged incidents. He argues, however, that through the use of improperly repetitive and suggestive questions, Heilemeier was able to change A.F.'s account and morph it into a claim that he removed his and A.F.'s clothing. Defendant maintains that Heilemeier used a similar technique to change A.F.'s initial statement that he did not touch her "butt" into a claim that he penetrated her anally. According to defendant, Heilemeier was able to get A.F. to change her mind by "using a question

to introduce new information in an interview when the child had not previously provided the interviewer with that information." Defendant argues that this interviewing method is " 'highly suggestive' and improper." We disagree that this occurred here. Regarding the clothing issue, Heilemeier's line of questioning was not improperly suggestive given that she was dealing with a five-year-old child, there were allegations of multiple instances of abuse, and she sought clarification on exactly what occurred. Indeed, Heilemeier acknowledged that leading questions are used after a child has made a disclosure and additional information is needed. That is what occurred here. Regarding the anal-penetration issue, we do not agree that this arose due to the use of the interviewing technique described by defendant. Contrary to defendant's claim, Heilemeier did not use a question to introduce new information not provided by A.F. Heilemeier initially asked A.F. if anyone had ever touched her in the "butt." A.F. responded in the negative. Heilemeier then asked A.F. who she should tell if such conduct occurs. A.F. responded that she should tell her mother. Heilemeier then stated that no one has the right to touch her on the "butt." Following up, Heilemeier asked A.F. "if somebody else or daddy try to touch you on your *gina or your privacy again*" (emphasis added) when A.F. cut her off and spontaneously declared that defendant touched her on her "butt" with his "wiener." Notably, Heilemeier's last statement before A.F. spoke was not a question and she did not suggest that defendant touched her "butt."

¶ 68    Defendant also claims that "[t]he degree of law enforcement involvement with A.F.'s interview, standing alone, fundamentally altered the dynamic of the interview and makes its reliability highly questionable." As far as we can tell, however, the only involvement of law enforcement during the interview was that they were part of the team observing the interview and providing Heilemeier with some follow-up questions. Defendant does not cite any authority that this renders the interview unreliable. Defendant insists that the involvement of law enforcement

was particularly problematic in this case because Heilemeier admitted that the same investigators interviewed L.F. (A.F.'s older half-sister) prior to A.F.'s interview. According to defendant, law enforcement's "subsequent direction of A.F.'s interview, knowing the specifics of L.F.'s disclosures in full and use of Heilemeier as a mere conduit for their suggestive questions provided the opportunity for the elicitation of disclosures from A.F. that comported with and corroborated L.F.'s allegations." We note that the record citation defendant provides for Heilemeier's "admission" is not accurate. The exchange between defense counsel and Heilemeier is as follows:

> "Q. And so in proximity to the date when [A.F.] made the allegations how soon is she in with you?
>
> A. I believe it was within a couple of days.
>
> Q. And this is also within a couple of days of the allegations of [L.F.] being abused. That's when that occurred?
>
> A. I believe she had been interviewed prior, but I wasn't the person that interviewed her so I have no idea.
>
> Q. You're talking about [L.F.]?
>
> A. Yes.
>
> Q. Were you aware that that had occurred?
>
> A. Yes, I was.
>
> Q. Going into [A.F.'s] interview?
>
> A. Yes."

We read nothing in this passage to support that that the same investigators interviewed L.F. Quite simply, there is no evidence to support defendant's claim that the involvement of law enforcement diminished the reliability of A.F.'s statements to Heilemeier.

¶ 69    Defendant also directs us to *People v. Zwart*, 151 Ill. 2d 37 (1992), in an attempt to impugn the reliability of A.F.'s statements to Heilemeier. Defendant claims that because law enforcement and DCFS investigators relayed questions to Heilemeier via an earpiece during her interview with A.F., as in *Zwart*, the reliability of A.F.'s statements is highly questionable. In *Zwart*, the alleged victim talked with several adults, including a police officer, a social worker, and a counselor, before she made any statements implicating the defendant. The State did not introduce any evidence regarding the substance of these interviews. The Illinois Supreme Court found that without this evidence, it was impossible to determine whether the victim was questioned in a suggestive manner or was encouraged to accuse the defendant of sexual abuse. *Zwart*, 151 Ill. 2d at 44-45. The court also found it impossible to determine if the young victim's precocious knowledge of sexual activity was due to sexual abuse, or was the result of suggestive interview techniques. *Zwart*, 151 Ill. 2d at 44-45. Therefore, the court concluded that the circumstances of the making of the victim's incriminating statements did not support the reliability of those statements. *Zwart*, 151 Ill. 2d at 46.

¶ 70    Here, unlike *Zwart*, A.F. was not interviewed by multiple persons prior to making her statements to Heilemeier. As noted, Heilemeier interviewed A.F. within a couple of days after A.F. disclosed to her mother (Albright) that defendant "humped her." There was no evidence that, after A.F.'s initial disclosure and prior to Heilemeier's interview, a police officer, a social worker, or a counselor spoke to A.F. about her allegations against defendant. More importantly, the recording of all questions asked by Heilemeier, including those relayed to her through an earpiece by the interdisciplinary team of investigators, was played at the section 115-10 hearing and assessed by the court. Unlike *Zwart*, the involvement of other investigators did not affect the ability of the trial court to determine if A.F. was questioned in a suggestive manner or had been encouraged to accuse

defendant, or whether A.F.'s knowledge of sexual activity was the result of suggestive questioning. Thus, *Zwart* does not support defendant's claims that the involvement of the investigators diminished the reliability of A.F.'s statements to Heilemeier. See also *Jahn*, 246 Ill. App. 3d at 704-05 (distinguishing *Zwart*).

¶ 71    In short, any purported issues with the interview identified by defendant do not outweigh the other clear indicia of reliability outlined above. Therefore, we do not find that the trial court abused its discretion in admitting A.F.'s statements to Heilemeier under section 115-10 of the Code.

¶ 72                        B. Sufficiency of the Evidence

¶ 73    Defendant next challenges the sufficiency of the evidence regarding his convictions of counts 5 and 6 of the indictment, which alleged that he knowingly committed acts of sexual penetration with A.F. in that he placed his penis in the anus of A.F. Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of those two counts because: (1) the State's case relating to those charges rested entirely on A.F.'s "otherwise unreliable out-of-court statement;" (2) A.F.'s out-of-court statement was vague, inconsistent, and contradictory; (3) the State did not corroborate A.F.'s claims with any occurrence witnesses or scientific evidence; and (4) he presented testimony from his mother and then-girlfriend refuting A.F.'s testimony.

¶ 74    A person commits the offense of predatory criminal sexual assault of a child if the accused was 17 years of age or older and commits an act of "sexual penetration" with a victim who was under 13 years of age when the act was committed. 720 ILCS 11-1.40(a)(1) (West 2014). For purposes of the predatory criminal sexual assault of a child statute, the term "sexual penetration" is defined in relevant part as "any contact, however slight, between the sex organ or anus of one

person and *** the sex organ *** or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including, but not limited to cunnilingus ***or anal penetration." 720 ILCS 5/11-0.1 (West 2012). "Evidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/11-0.1 (West 2012).

¶ 75     When faced with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Rather, the relevant inquiry is whether the evidence, construed in the light most favorable to the State, would allow any rational trier of fact to find beyond a reasonable doubt the essential elements of the crime charged. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This means that we must draw all reasonable inferences from the record in favor of the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even if the testimony is contradicted by the accused. *People v. Bailey*, 311 Ill. App. 3d 265, 269 (2000); *People v. Tigner*, 194 Ill. App. 3d 600, 606 (1990). Moreover, it is the function of the trier of fact to assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). Discrepancies, omissions, and bias go to the weight of the testimony to be evaluated by the trier of fact. *People v. Mendoza*, 62 Ill. App. 3d 609, 616-17 (1978). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. *People v. Billups*, 384 Ill. App. 3d 844, 846 (2008).

¶ 76     Defendant argues that the convictions on the two counts of predatory criminal sexual assault predicated on anal penetration should be reversed because the evidence of his guilt was

insufficient and unreliable. Defendant contends that the State's case on these two charges rested entirely on isolated portions of A.F.'s out-of-court statements at the forensic interview. According to defendant, however, A.F.'s statements were not credible because A.F. admitted that her mother "explained" what happened to her before the interview, A.F. only alleged anal penetration after Heilemeier "led her to allege such abuse after numerous prior denials of anal abuse," and A.F. contradicted her allegations during her trial testimony and denied that defendant made any contact with her anus.

¶ 77 In this case, we find the jury was in the best position to determine the credibility and weight of the testimony and to resolve any inconsistencies or conflicts therein. At the forensic interview, Heilemeier asked A.F. if anyone had ever touched her butt. A.F. initially responded in the negative. However, Heilemeier explained that to a five-year-old child, the word "touching" usually indicates the use of hands. Moreover, A.F. subsequently told Heilemeier that defendant put his penis "inside" her "butt" two times. A.F. repeated this allegation near the end of the interview. Additionally, A.F. provided a considerable amount of detail concerning the incidents of anal penetration, including how she and defendant were positioned and how defendant performed the acts. A.F. stated that when defendant put his penis in her anus, she was lying down facing away from defendant's face and defendant was on top of her. A.F. further recounted that prior to putting his penis in her anus, defendant applied spit from his mouth to his penis. A.F. further stated that defendant told her that the spit would make it feel better, but A.F. told Heilemeier that the spit did not help and that it felt "bad" and "hurt" when defendant inserted his penis in her anus. As noted, there is nothing in the record to suggest that A.F. had a motive to lie. Furthermore, there is no evidence to explain A.F.'s considerable knowledge of the sexual acts she described. Indeed, given

this record, the jury could reasonably conclude that these are the types of details that a child of five years old would not remember unless he or she experienced it.

¶ 78    Defendant notes that A.F. did not repeat the allegations of anal penetration at trial. To the contrary, she specially denied on both direct and cross-examination that he touched any part of her body that she did not like other than her vagina. Defendant further notes that A.F.'s statements during the forensic interview and her testimony at trial were inconsistent regarding whether any part of his body went "inside" of A.F. and whether she and defendant were wearing clothes at the time of the alleged offenses. Defendant further asserts that the presence of clothes would have rendered it physically impossible for him to have committed the act of anal penetration. Defendant contends that these inconsistencies cast serious doubt on A.F.'s assertion that he anally penetrated her on two occasions. However, given that A.F. was five years old when the incidents occurred and when she was interviewed by Heilemeier and more than three years passed between A.F.'s interview and her trial testimony, it is understandable that there may be some differences in her recitation of events and that she could not recall with specificity certain details. See *People v. Olla*, 2018 IL App (2d) 160118, ¶ 36 (holding that were child sexual abuse victim was about 9 at the time of the abuse and 13 years old at trial, "[c]ommon sense dictate[d] that she was being truthful and that the inconsistencies were due to her young age and the time that passed between the events and the trial."). As noted above, A.F. affirmatively told Heilemeier during the forensic interview that defendant penetrated her anus with his penis on two occasions. Further, A.F. provided details regarding the occurrences that a five-year-old child would not possess unless he or she experienced it. To the extent that there were inconsistencies in A.F.'s statements to Heilemeier at the forensic interview, her testimony at trial, and between A.F.'s statements to Heilemeier and her trial testimony, it was the province of the jury, as the trier of fact, to weigh the evidence, assess the

credibility of the witnesses, and resolve any conflicts in the evidence. *Ortiz*, 196 Ill. 2d at 259. By returning a verdict of guilty, the jury resolved any conflict in A.F.'s statements to Heilemeier and her trial testimony against defendant. We find the jury's determination was reasonable in light of the record before us. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 79    Defendant also argues that A.F.'s out-of-court statements regarding the charges of anal penetration were unreliable because they were vague as to when the purported incidents happened. He notes that during Heilemeier's interview with A.F., the minor could not articulate when the first instance of purported anal penetration occurred or when the most recent incident occurred with any specificity other than that they happened "in the nighttime and morning time" or "in the morning and night" and she was five years old at the time. However, a witness's inability to remember exact dates and times, by itself, does not create a reasonable doubt. *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990). Rather, it merely affects the weight of the witness's testimony. *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990). As noted, A.F. was only five years old at the time of the offenses and at the time she was interviewed by Heilemeier. Given her tender age, it is understandable that A.F. could not remember the exact dates or timing of the incidents. See *People v. Nevilles*, 2021 IL App (1st) 191388, ¶ 59; *People v. Escobedo*, 151 Ill. App. 3d 69, 82 (1986).

¶ 80    Defendant contends that A.F.'s statements were not credible because there was substantial evidence that Albright (A.F.'s mother) spoke with A.F. prior to the forensic interview and coached A.F. to disclose certain allegations. A.F. did testify at trial that Albright had been helping her remember what defendant did to her by "explaining it to [her]." Specifically, A.F. recalled that Albright told her that defendant "hurt" her. Significantly, however, A.F. never testified that Albright coached her or fabricated the allegations against defendant. To the contrary, she stated that she knew the difference between the truth and a lie and that she told the truth to Heilemeier.

Further, Albright denied telling A.F. what to say to Heilemeier other than to tell the truth. The jury heard this testimony and found that A.F.'s statements to Heilemeier did not detract from her credibility. The jury, as the trier of fact, was in a superior position to make this assessment. We cannot say that this conclusion was so unreasonable as to justify reversal of defendant's convictions.

¶ 81    Defendant also contends that the State did not corroborate A.F.'s claims that he penetrated her anally with any occurrence witnesses or scientific evidence. Defendant does not cite any authority that either an occurrence witness or scientific evidence is required to support a sexual assault conviction. To the contrary, the credible testimony of one witness is sufficient to support a conviction for sexual assault. As noted previously, by returning a verdict of guilty, the jury clearly found A.F.'s testimony credible.  As the trier of fact, it was the jury's duty to assess the credibility of the witnesses, weigh the evidence, and resolve any conflicts in the testimony. *Ortiz*, 196 Ill. 2d at 259. As such, we decline to disturb the jury's verdict due to the lack of any occurrence witnesses. *Tigner*, 194 Ill. App. 3d at 606 (holding that because the record supported the trier of fact's determination that the complaining witness was credible, her testimony was sufficient evidence to support the defendant's convictions beyond a reasonable doubt). Moreover, it is well settled that scientific or physical evidence is not required to show that a sexual assault occurred. *Nevilles*, 2021 IL App (1st) 191388, ¶ 65. In this case, although Krueger, the sexual assault nurse who examined A.F., testified that A.F. had a normal hymenal and anal examination, she stated that the absence of a visible injury does not rule out sexual abuse. Krueger also noted that A.F. had a history of constipation, which is a symptom of young victims who disclose anal penetration. We therefore find that defendant's contention that the State did not corroborate A.F.'s claims that he penetrated her anally with any occurrence witnesses or scientific evidence does not compel a finding that the

evidence was insufficient to convict him of the anal-penetration offenses beyond a reasonable doubt.

¶ 82    Finally, defendant directs us to the testimony of his mother (Farris) and girlfriend (Brown). According to defendant, the testimony of both Farris and Brown indicated they were present at the home where he lived on every occasion when A.F. visited in 2015 and they did not observe any abuse or signs of abuse. Furthermore, he asserts that Farris and Brown contradicted A.F.'s account of the sleeping arrangements at the house. However, it was the duty of the trier of fact to assess the credibility of the witnesses, weigh the evidence, and resolve any conflicts in the evidence. *Ortiz*, 196 Ill. 2d at 239. In this case, the jury observed A.F.'s demeanor at trial and could weight her testimony along with that of Farris and Brown. By returning a verdict of guilty, the jury resolved any conflict in the testimony of A.F., Farris, and Brown against defendant. We find the jury's determination was reasonable in light of the record before us. *Cunningham*, 212 Ill. 2d at 283.

¶ 83    In short, as previously stated, it is not our task to reweigh the evidence presented at trial. Rather, it is the function of the trier of fact, in this case the jury, to weigh the evidence, determine the credibility of the witnesses, and resolve conflicts in the evidence. The jury observed A.F.'s demeanor during the video-recorded forensic interview with Heilemeier as well as A.F.'s testimony at trial. The weaknesses in the evidence that defendant cites on appeal were all presented to and rejected by the jury. See *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Accordingly, viewing the evidence in the light most favorable to the State, as we must, we conclude that the evidence was sufficient to sustain the two predatory criminal sexual assault convictions defendant challenges here. Thus, we affirm defendant's convictions.

¶ 84                      C. Motion to Suppress Audio Recordings

¶ 85    Next, defendant contends that the trial court erred when it denied his pretrial motion to suppress audio recordings of phone calls between himself and Mayry during which he made potentially incriminating statements that he previously touched L.F. According to defendant the audio recordings were inadmissible at trial because the application for the order to overhear the phone calls did not conform to the requirements of section 108A-1 of the Code (725 ILCS 5/108A-1 (West 2014)) in that: (1) Schmack, the DeKalb County State's Attorney, neither signed the application nor executed any specific document delegating his power to authorize overhears to the assistant state's attorney who did sign the application; and (2) the State did not establish that Schmack was unavailable or that the assistant state's attorney made any effort to contact Schmack to seek his approval prior to applying for the overhear. Defendant concedes that the State did not introduce the audio recordings at trial. Nevertheless, he contends that the denial of the motion to suppress did not constitute harmless error because "the threat of its admission prevented [him] from testifying in his own defense and otherwise putting on a full defense to the State's charges." Notably, defendant asserts that if the trial court had suppressed the improperly recorded audio, he "could have taken the stand, offered an explanation for his prior conduct with L.F. and been able to deny A.F.'s allegations fully."

¶ 86    The State responds that the trial court's denial of defendant's motion to suppress the audio recordings at issue was not error where the record demonstrates that the application for overhear was signed by an assistant state's attorney authorized by the state's attorney as required by statute. See 725 ILCS 5/108A-1 (West 2014). The State further responds that even if the trial court's ruling constituted error, it was harmless and did not substantially prejudice defendant where the court granted the State's motion to admit evidence of the commission of other sex offenses and another

victim, L.F., testified to a multi-year history of defendant having inappropriate sexual contact with her.

¶ 87    Illinois has a statutory prohibition against eavesdropping except under certain circumstances. 720 ILCS 5/14-1 *et seq*. (West 2014). Relevant here, it is not a violation of the eavesdropping statute "to surreptitiously use an eavesdropping device to overhear, transmit, or record a private conversation, or to surreptitiously intercept, record, or transcribe a private communication, if the overhearing, transmitting, recording, interception, or transcription is done in accordance with Article 108A or Article 108B of the Code of Criminal Procedure of 1963." 720 ILCS 5/14-2(a-5) (West 2016). Article 108A of the Code (725 ILCS 5/108A-1 *et seq*. (West 2014)) governs authorizations for the use of an eavesdropping device that are obtained with one party's consent, whereas article 108B of the Code (725 ILCS 5/108B-1 *et seq*. (West 2014)) governs electronic criminal surveillance where no party has consented. *People v. Coleman*, 227 Ill. 2d 426, 434 (2008).

¶ 88    In this case, defendant sought to suppress the overhear based on a violation of article 108A of the Code (725 ILCS 5/108A *et seq*. (West 2014)). Section 108A-1 of the Code (725 ILCS 5/108A-1 (West 2014)) sets out the process for obtaining authorization for the use of an eavesdropping device and provides in relevant part as follows:

"§ 108A-1. Authorization for use of eavesdropping device. *The State's Attorney or an Assistant State's Attorney authorized by the State's Attorney* may authorize an application to a circuit judge or an associate judge assigned by the Chief Judge of the circuit for, and such judge may grant in conformity with this Article, an order authorizing or approving the use of an eavesdropping device by a law enforcement officer or agency having the responsibility for the investigation of any felony under Illinois law where any

one party to a conversation to be monitored, or previously monitored in the case of an

emergency situation \*\*\*, has consented to such monitoring." (Emphasis added.) 725 ILCS

5/108A-1 (West 2018).

In reviewing a trial court's ruling on a motion to suppress evidence, we typically apply the two-part standard of review adopted by the United States Supreme Court in *Ornelas v. United States*, 570 U.S. 690, 699 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Allard*, 2018 IL App (2d) 160927, ¶ 22. Under this standard, the trial court's factual findings and credibility determinations are accorded great deference and will be overturned only if they are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542; *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 17. A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 17. A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. *Allard*, 2018 IL App (2d) 160927, ¶ 22. As such, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Luedemann*, 222 Ill. 2d at 542; *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 17; *Allard*, 2018 IL App (2d) 160927, ¶ 22.[4]

---

[4] Defendant suggests that the two-part standard of review does not apply here because there are no disputed factual issues that are relevant to the trial court's suppression order and our review only involves an application of the law to those undisputed facts. See *Allard*, 2018 IL App (2d) 160927, ¶ 22 (noting that where facts are not disputed, the court undertakes an independent assessment of those facts and reviews the suppression orders *de novo*). Even if the circumstances underlying the application for the overhear at issue are undisputed, the trial court in this case

¶ 89    The sole witness at the evidentiary hearing on defendant's motion to suppress was Richard

Schmack, the DeKalb County State's Attorney in 2015. At the hearing, Schmack acknowledged

that he did not sign the application for overhear at issue. Instead, the application was signed by

Carrie Thompson, an assistant state's attorney in Schmack's office. Schmack further testified that

although he never executed any document authorizing Thompson to apply for the specific order

obtained in defendant's case, Thompson was authorized to approve overhear applications and go

with officers to obtain the order from a judge. Schmack also stated that he signed Thompson's oath

of office when she was sworn in as an assistant state's attorney, which oath allowed her to "take

actions on [his] behalf as an Assistant State's Attorney under [his] authority as State's Attorney."

The trial court found Schmack's testimony credible. Based on our review of Schmack's testimony,

the trial court's assessment was not against the manifest weight of the evidence. Moreover, given

Schmack's testimony that he authorized Thompson to approve overhear applications and

accompany officers to obtain overhear orders from a judge, the trial court could reasonably

conclude that Schmack authorized Thompson to apply for the consensual overhear at issue as

---

clearly relied on an assessment of Schmack's credibility in resolving this issue. As noted, the

assessment of witness credibility is a factual matter for the trier of fact to decide. See *Luedemann*,

222 Ill. 2d at 542; *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 17. Accordingly, we adhere to the

two-part standard of review outlined above. See *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 29

(noting that *de novo* review is appropriate where neither the facts nor the credibility of witnesses

is disputed). Nevertheless, even if we were to review this issue using only the *de novo* standard,

we would reach the same result.

required by section 108A-1 of the Code. Thus, we conclude that the trial court did not err in denying defendant's motion to suppress.

¶ 90    Despite the foregoing, defendant insists that that the State's application for an overhear order failed to comply with section 108A-1 of the Code (725 ILCS 5/108A-1 (West 2014)) because Schmack admittedly did not execute any specific document delegating his power to authorize overhears to Thompson and there was no evidence that Schmack was unavailable. We disagree with defendant's position.

¶ 91    Defendant's argument requires us to construe the language of section 108A-1 of the Code (725 ILCS 5/108A-1 (West 2014)). Statutory construction is a question of law, subject to *de novo* review. *People v. Manning*, 2018 IL 122081, ¶ 16; *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 18. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Village of Lake in the Hills v. Niklaus*, 2014 IL App (2d) 130654, ¶ 15. The most reliable indicator of legislative intent is the language of the statute itself, which should be given its plain and ordinary meaning. *Village of Lake in the Hills v. Niklaus*, 2014 IL App (2d) 130654, ¶ 15. Only where the language of the statute is ambiguous, or where a literal interpretation of the statute would either lead to absurd results or thwart the goals of the statutory scheme, may a court look beyond the express language of the statute and consider extrinsic aids of construction. *Lansing v. Southwest Airlines Co.*, 2012 IL App (1st) 101164, ¶ 30; *NDC LLC v. Topinka*, 372 Ill. App. 3d 341, 359 (2007).

¶ 92    Contrary to defendant's position, the plain language of section 108A-1 does not require the State's Attorney to execute a *written* authorization delegating his or her power to request an overhear to an assistant state's attorney. The statute merely requires that the assistant State's Attorney be "authorized by the State's Attorney." 725 ILCS 5/108A-1 (West 2014). As discussed

above, Schmack testified that he provided such authorization to Thompson. Schmack's testimony on this point was sufficient to comply with the authorization requirement in section 108A-1. See *People v. Lewis*, 84 Ill. App. 3d 556, 560 (1980) (interpreting previous version of section 108A-1 and holding that there is no requirement that the state's attorney's authorization be in writing). Likewise, there is no language in the statute providing that the state's attorney must be unavailable before he or she can delegate the authority to apply for an order approving the use of an eavesdropping device.

¶ 93    Indeed, defendant does not cite any language in section 108A-1 in support of his interpretation. Instead, he directs us to *Allard*, 2018 IL App (2d) 160927. *Allard* involved applications for nonconsensual electronic surveillance under article 108B of the Code (725 ILCS 5/108B (West 2014)). Article 108B provides in pertinent part that "[t]he State's Attorney, or a person designated in writing or by law to act for him and to perform his duties during his absence or disability" may apply for an order authorizing the interception of a private communication when no party has consented to the interception. 725 ILCS 5/108B-3(a) (West 2014). In *Allard*, this court upheld the trial court's suppression of evidence derived from wiretaps, holding that the applications for the nonconsensual electronic surveillance were facially deficient in that they lacked adequate statements of the authority under which the assistant state's attorneys who signed and presented the documents were making the applications. *Allard*, 2018 IL App (2d) 160927, ¶¶ 30-39. Specifically, the assistant state's attorneys did not identify the source of their authority to make the applications, attach documentation of the State's Attorney's purported delegation of such authority, or affirmatively state that the State's Attorney was absent or disabled. *Allard*, 2018 IL App (2d) 160927, ¶ 33. We find defendant's reliance on *Allard* misplaced for multiple reasons.

¶ 94    First, *Allard* and this case involve different statutes. *Allard* concerned article 108B of the Code. As noted previously, article 108B governs authorization for the interception of a private communication where no party has consented to the interception. See 725 ILCS 5/108B-3 (West 2014). The order at issue in this case was sought and authorized pursuant to article 108A of the Code, which governs authorization for the use of an eavesdropping device where one party has consented to such monitoring. See 725 ILCS 5/108A-1 (West 2014). Unlike article 108B, article 108A does not include a requirement that the state's attorney's delegation of authority be in writing or that the state's attorney be unavailable prior to delegating such authority. Compare 725 ILCS 5/108A-1 (West 2014) (providing that "[t]he State's Attorney or an Assistant State's Attorney authorized by the State's Attorney" may apply for an order authorizing the use of an eavesdropping device where any one party to a conversation to be monitored has consented to such monitoring) with 725 ILCS 5/108B-3 (West 2014) (providing that "[t]he State's Attorney, or a person designated in writing or by law to act for him and to perform his duties during his absence or disability" may apply for an order authorizing the interception of a private communication when no party has consented to the interception).

¶ 95    Second, the applications in *Allard* were found to be facially deficient because they did not adequately set forth the authority under which the assistant state's attorneys were making the applications. In this case, defendant does not expressly argue that the applications at issue were facially deficient based on the assistant state's attorney failure to adequately set forth the authority under which she was making the application. Rather, as we interpret his argument, defendant claims that the overhear orders were invalid because the State's Attorney did not sign the application for the overhear order and he did not execute a written document delegating his power to seek overhears to the assistant State's Attorney who signed the application for overhear. As

discussed above, however, the plain language of article 108A does not require the State's Attorney to execute a written document to delegate his power to apply for overhears. Defendant also contends that the State did not present evidence that Schmack was unavailable or that Thompson made any effort to contact Schmack to seek his approval prior to presenting the application to the court. He neglects to cite any language in article 108A requiring that the State's Attorney be unavailable prior to delegating his or her authority or that an authorized assistant State's Attorney seek the State's Attorney's approval again after already receiving it.

¶ 96    Third, even if defendant had argued that the eavesdropping orders were invalid because the written application did not adequately set forth authority under which the assistant state's attorney was making the application, we would be unable to address the claim because a copy of the application has not been included in the record on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (holding that any doubts arising from the incompleteness of the record are resolved against the appellant).

¶ 97    In short, we conclude that the trial court properly denied defendant's motion to suppress the audio recordings at issue. Given our conclusion, we do not address defendant's harmless-error argument.

¶ 98                                D. Jury Instructions

¶ 99    Finally, defendant asserts that the trial court's instruction to the jury on the definition of "sexual penetration" was erroneous. In particular, defendant contends that the trial court improperly expanded the predatory criminal sexual assault charges by instructing the jury that it could find him guilty based on sexual penetration by "contact" when the indictment alleged only penetration by "intrusion." According to defendant, this was an unauthorized amendment of the indictment and denied him a fair trial. Defendant further argues that this issue was "fully

preserved" where he lodged a contemporaneous objection to the instruction during the instruction conference and included the issue in his posttrial motion.

¶ 100   The State initially responds that defendant forfeited this issue because he withdrew his objection and assented to the definition of "sexual penetration" offered by the State at the instruction conference, which definition encompassed sexual penetration by contact. On the merits, the State argues that the indictment's allegation of the specific manner of commission constituted surplusage so that the trial court properly instructed the jury that "sexual penetration" means either "contact" or "intrusion."

¶ 101   Initially, we disagree the State's contention that defendant has forfeited this issue. To preserve an issue for review, a defendant must make both an objection at trial and raise the matter in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). In this case, defendant filed a posttrial motion arguing, *inter alia*, that the trial court improperly instructed the jury that "sexual penetration" meant either "intrusion" or "contact" where the indictment only specified an intrusion. Moreover, as explained below, defendant did not withdraw his objection and assent to the definition of "sexual penetration" offered by the State at the instruction conference.

¶ 102   At the instruction conference, the State offered an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 11.65E (4th ed. 2000) (hereinafter IPI Criminal 4th), providing that:

> "The term 'sexual penetration' means any contact, however slight, between the sex organ or anus of one person and the sex organ of another person or intrusion, however slight, of any part of the body of one person into the sex organ of another person including but not limited to cunnilingus or anal penetration. Evidence of emission of semen is not required to prove sexual penetration."

When the State first proposed the instruction, the defense did not object. However, prior to the close of evidence, defense counsel asserted that the contact portion of the sexual penetration definition should not be given because the indictment alleged only an intrusion by defendant's penis into A.F.'s vagina and anus. During the discussion that ensued, the trial court referenced *People v. Dennis*, 2016 IL App (2d) 141048-U (unpublished order under Illinois Supreme Court Rule 23). The trial court noted that in *Dennis*, this court held that the jury was properly instructed that the term "sexual penetration" meant either "intrusion" or "contact" even though the indictment specified intrusion because the indictment's allegation of the specific manner of commission was surplusage. Following additional discussion, defense counsel stated that if the court was inclined to accept the reasoning in *Dennis*, "then the way that the State has it written which follows the way it was written in *Dennis* covers them both and clearly in *Dennis* they address the same issue and felt it was appropriate." Accordingly, the trial court instructed the jurors in accordance with the language of IPI Criminal 4th No. 11.65E as set forth above, *i.e.*, that "sexual penetration" meant either "intrusion" or "contact." Contrary to the State's claim, we do not interpret defense counsel's statement at the instruction conference as a withdrawal of its earlier objection. Rather, defense counsel's statement was merely a recognition that if the court accepted the reasoning in *Dennis*, then the State's instruction was appropriate. As such, we reject the State's claim that defendant forfeited this issue on appeal. We now turn to the merits.

¶ 103   Jury instructions are generally reviewed for an abuse of discretion. *People v. Salazar*, 2014 IL App (2d) 130047, ¶ 61. However, when, as here, the question is whether the applicable law was accurately conveyed, our standard or review is *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). As for indictments, generally, once an indictment has been returned by the grand jury, it may not be broadened through amendment, except by the grand jury itself. *People v. Ross*, 395 Ill.

App. 3d 660, 667 (2009). However, this rule applies to substantive amendments. See *Ross*, 395 Ill. App. 3d at 667-68. Formal defects in an indictment may be amended at any time by the State or the defense, and amendments changing the manner in which the defendant committed the offense are formal, not substantive. *Ross*, 395 Ill. App. 3d at 667, 670.

¶ 104   As charged in this case, section 11-1.40(a)(1) of the Criminal Code of 2012 provides in pertinent part that a person commits predatory criminal sexual assault of a child if that person is over 17 years of age and commits an act of sexual penetration with a victim under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2016). For purposes of section 11-1.40(a)(1), the term "sexual penetration" is defined as:

> "[A]ny contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/11-0.1 (West 2012).

The instruction tendered to the jury was based on IPI Criminal 4th No. 11.65E, which tracks the statutory definition of "sexual penetration" set forth above.

¶ 105   Citing *People v. Lara*, 2012 IL 112370, and *People v. James*, 331 Ill. App. 3d 1064 (2002), defendant suggests that section 11-1.40(a)(1) of the Criminal Code (720 ILCS 5/11-1.40(a)(1) (West 2012)) requires that the specific type of sexual penetration alleged in the indictment must be proven at trial.[5] For instance, defendant notes that in *Lara*, the supreme court stated that, as

---

[5] Defendant cites to section 12-14.1(a)(1) of the Criminal Code [of 1963] (720 ILCS 5/12-

applied in that case, the element of penetration "is statutorily defined as 'any intrusion, however slight, of any part of the body of one person *** into the sex organ *** of another person.' " *Lara*, 2012 IL 112370, ¶ 54 (quoting 720 ILCS 5/12-12(f) (West 2004)). However, at issue in *Lara* was whether the *corpus delicti* rule requires independent evidence corroborating every element of the specified offense before a defendant's statement could be used to prove the *corpus delicti* of the offense. *Lara*, 2012 IL 112370, ¶ 15. At no point in *Lara* did the supreme court discuss whether the specific type of penetration alleged in the indictment must be proven at trial. Thus, defendant's reliance on *Lara* is misplaced.

¶ 106   *James* is also inapposite. In *James*, the defendant was charged with and convicted of one count of predatory criminal sexual assault of a child in that he "placed his finger in the sex organ" of the victim. On appeal, the defendant argued that the trial court improperly instructed the jury with a modified pattern jury instruction that defined "sexual penetration" as "any contact, however slight, between the sex organ of one person and an object *or finger*." (Emphasis added.) The reviewing court held that the tendered instruction was "clearly erroneous." *James*, 331 Ill. App. 3d at 1067-69. The instruction, which the State proposed, was a "modified 'contact clause' definition" of sexual penetration. The court noted, however, that prior to the defendant's trial, it had held in

---

14.1(a)(1) (West 2010)) for the offense of predatory criminal sexual assault. Similarly, defendant cites to section 12-12(f) of the Criminal Code [of 1963] for the statutory definition of sexual penetration. We note that these sections were repealed, renumbered, and amended by Public Act 96-1551 (Pub. Act 96-1551, art. 2, §§ 5-6 (eff. July 1, 2011) (renumbering and amending 720 ILCS 5/12-12(f) as 720 ILCS 5/11-0.1 and 720 ILCS 5/12-14.1(a)(1) as 720 ILCS 5/11-1.40(a)(1)). Moreover, defendant was charged under section 11-1.40(a)(1) of the Criminal Code.

another case, *People v. Maggette*, 311 Ill. App. 3d 388, 397 (2000), that a body part such as a finger is not an "object" within the context of the contact clause of the statutory definition of sexual penetration. *James*, 331 Ill. App. 3d at 1068-69. The supreme court affirmed the appellate court's holding in *Maggette. People v. Maggette*, 195 Ill. 2d 336, 349 (2001). Thus, the instruction misstated the law and was contrary to the *Maggette* decisions. *James*, 331 Ill. App. 3d at 1069. Although the *James* court referred to the statutory definition of "sexual penetration" as having both a " 'contact' clause" and an " 'intrusion' clause" (*James*, 331 Ill. App. 3d at 1069), the court did not discuss whether the specific type of penetration alleged in the indictment must be proven at trial.

¶ 107    Indeed, defendant fails to address cases specifically holding that it is unnecessary for the indictment to distinguish between the types of penetration and that the State need only prove that *a* type of sexual penetration occurred. Notably, Illinois courts have rejected the argument that the specific conduct constituting penetration is an element of criminal sexual assault. See, *e.g.*, *People v. Carter*, 244 Ill. App. 3d 792, 803-04 (1993) ("Illinois case law provides that the type of sexual penetration is not an element of the offense, and its inclusion in the indictment is merely surplusage"); *People v. Foley*, 206 Ill. App. 3d 709, 718-19 (1990) (holding that the indictment's reference to sexual penetration through contact between the defendant's penis and the complainant's vagina was merely surplusage and need not have been proven for the defendant to be convicted of the offense charged); *People v. Tanner*, 142 Ill. App. 3d 165,169 (1986); see also *Ross*, 395 Ill. App. 3d at 670 (citing to *Carter* and *Foley*). Instead, "Illinois case law provides that the type of sexual penetration is not an element of the offense, and its inclusion in the indictment is mere surplusage." *Carter*, 244 Ill. App. 3d at 803-04. "If the statutory language used describes specific conduct, it is unnecessary for the indictment to specify the exact means by which the

conduct was carried out. [Citation.] The State need only prove that *a* type of sexual penetration occurred beyond a reasonable doubt." *Foley*, 206 Ill. App. 3d at 718 (Emphasis in original.) Thus, when an indictment charges a defendant with sexual penetration, which is the specific conduct prohibited in the relevant statute, it is unnecessary for the indictment to specify the exact means by which the sexual penetration was carried out. *Ross*, 395 Ill. App. 3d at 670. Based on these principles, the sexual acts themselves are not required to be detailed in the instructions. *Carter*, 244 Ill. App. 3d at 804.

¶ 108   Here, the counts of the indictment properly alleged sexual penetration, which is statutorily defined as either "contact" or "intrusion." 720 ILCS 5/11-0.1 (West 2012). The indictment did not need to specify the sexual act at all, and that it did specify intrusion was surplusage. *Carter*, 244 Ill. App. 3d at 803-04. Thus, the State was free to prove sexual penetration by either contact or intrusion, and the jury was properly instructed as such. See *People v. Meras*, 284 Ill. App. 3d 157, 164 (1996) (holding that where an indictment alleges the essential elements of the offense under the statute, other matters unnecessarily added may be rejected as surplusage). Further, defendant does not contend that he was misled in preparing his defense because of the language in the indictment. See *Meras*, 284 Ill. App. 3d at 164-65 (concluding that variance in indictment and proof did not mislead the defendant where the indictment fully informed him of the charge against him with sufficient specificity to allow him to prepare his defense). In light of the foregoing, we conclude that there was no improper expansion or amendment of the indictment.

¶ 109                                III. CONCLUSION

¶ 110   For the reasons stated, we affirm the judgment of the circuit court of DeKalb County.

¶ 111   Affirmed.